## Case No. 9,824.

### In re MORRIS et al.

[19 N. B. R. 111; 19 Alb. Law J. 281; 36 Leg. Int. 215; 26 Pittsb. Leg. J. 121.] [1]

District Court, W. D. Pennsylvania. March 7, 1879.

BANKRUPTCY—DISCHARGE—BY DECREE OF COURT —COMPOSITION PROCEEDINGS—PECUNIARY CONSIDERATION TO CREDITOR.

No act done in composition proceedings, though of the description of the offence mentioned in the eighth clause of section 5110, Rev. St., can be set up against the discharge of a bankrupt by decree of the court.

Rule to show cause why the specifications of objections filed should not be stricken off as insufficient in law, and the said petitioners [Morris and Nathan Morganstern] be discharged.

Malcolm Hay, for opposing creditors.
S. Schayer, Jr., for bankrupts.

## Case No. 9,825.

### In re MORRIS.

[Crabbe, 70; 1 Law Rep. 354.] [1]

District Court, E. D. Pennsylvania. Feb. 3, 1837.

BANKRUPTCY—EFFECT OF SUPERSEDEAS—JURISDICTION OF DISTRICT JUDGE — DEBTS PROVEN — LACHES—PRESUMPTION OF PAYMENT—NOTICE.

1. The effect of a supersedeas, lawfully ordered, is to annihilate a commission of bankruptcy, and to place the bankrupt with his estate and effects in the same situation they would have been in had it never existed.

[1] [Reprinted from 19 N. B. R. 111, by permission. 19 Alb. Law J. 281, contains only a partial report.]

[1] [Reported by William H. Crabbe, Esq. 1 Law Rep. 354, contains only a partial report.]

2. In England, the chancellor's authority, in bankruptcy, is without any precise boundaries, and is exercised on very broad and general principles, for the purposes of justice and the protection of parties.

3. In England, the authority of chancery, in bankruptcy, is derived from the bankrupt laws, either by express grant or by construction or implication, and not from the general power of the chancellor.

4. A district judge of the United States has power to supersede a commission of bankruptcy, by construction or implication from the bankrupt law of the 4th April, 1800 (1 Story's Laws, 732 [1 Stat. 197]), and without the express grant of such power therein.

[Cited in Re Hamlin, Case No. 5,994; Re Thomas, Id. 13,891; Allen v. Thompson, 10 Fed. 123.]

5. It cannot be inferred from Lucas v. Morris [Case No. 8,587], that the district judges possess no powers, under the bankrupt law, that are not expressly given to them.

6. Neither the English chancellor nor a district judge of the United States has any jurisdiction, in bankruptcy, virtute officiorum, but only from the statutes.

[Cited in Re Thomas, Case No. 13,891.]

7. A supersedeas may be issued after a bankrupt has obtained his certificate.

8. A decree, rightfully and deliberately made, and long acquiesced in by all parties interested, will not be revoked unless it be clearly shown that justice requires it.

9. The commissioners of a bankrupt's estate cannot allow a judgment debt, which has slept for thirty years, to be proved before them, unaccompanied by sufficient reasons for the neglect to prosecute it.

[Cited in Re Thomas, Case No. 13,891.]

10. The presumption of payment from lapse of time may be rebutted by circumstances which are for the consideration of a jury; but when a petitioner seeks to have a supersedeas of a commission of bankruptcy revoked, in order to allow him to prove debts against which there is a primâ facie presumption of payment, he must satisfy the court that he has a fair and reasonable expectation of rebutting the presumption, if the opportunity is afforded him.

11. What effect the bankruptcy and death of a party will have to prevent the barring, by lapse of time, of a judgment against him, is a question of law for the court to decide; as, also, the difference between a bond and a judgment with reference to the presumption of payment arising from lapse of time.

12. The fact that any interest, however small, will profit thereby, is not sufficient ground to revoke a decree; the preponderance of equity on the whole case will be looked to.

[Cited in Re Thomas, Case No. 13,891.]

13. There is nothing unusual, illegal, or improper, in the bonâ fide assignee of a judgment becoming the purchaser, at sheriff's sale thereon; or in his giving a credit on the judgment for the amount of the purchase-money. Neither is it illegal in such a holder of a judgment to purchase, in his own name, but for the use of the representatives of the original defendant, a portion of the property sold.

14. An order of supersedeas will annul a commission of bankruptcy without a formal writ being issued.

15. The fact of certain creditors of a bankrupt residing in the city where the legal proceedings are had, does not entitle them to any more special notice of the various steps taken than those who live at a distance. The only notice required is by Gazette.

16. R. M., a certified bankrupt, died during the continuance of the commission, having first devised to his wife all his property, real or personal, which he then possessed or might afterwards acquire. Subsequently, M. M., the wife, died, having first devised all her estate, real and personal, to N., a daughter, and making H. M., a son, her executor. Real property of R. M. being afterwards discovered, H. M. had sufficient interest therein to entitle him to petition for, and obtain, a supersedeas of the commission.

17. It is doubtful whether a certified bankrupt, pending the commission, has such a possibility coupled with an interest in property discovered after his death, as will enable such property to pass under a general devise by him.

18. Where a petitioner, subsequently to filing his petition, acquires a new right, which is matter of record, and does not affect the merits of the controversy, and the opposing parties do not, within a reasonable time, object to his original right, or require him to show that subsequently acquired, they lose their ability so to object or require.

19. The bankrupt law (of 4th April, 1800: 1 Story's Laws, 732 [1 Stat. 19]), requires extraordinary promptness on the part of the creditors to bring the proceedings to a close, and countenances no neglect or delay.

[Cited in Re Robinson, Case No. 11,941; Re Thomas, Id. 13,891.]

On the 28th of July, 1801, a commission of bankruptcy, under the act of 4th April, 1800 (1 Story's Laws, 732 [1 Stat. 19]), was issued from the district court for the district of Pennsylvania, against Robert Morris; after various preliminary proceedings, and the proof of sundry debts, amounting in the whole to about three millions of dollars, the commissioners executed an assignment to John R. Smith, John Craig, and Nathan Field, on the 8th December, 1801, they having been elected assignees by the creditors. All proceedings then ceased, and, up to the year 1825, no action of any kind was taken in the matter. On the 21st November, 1825, Henry Morris, a son of Robert Morris, petitioned Judge Peters, the then district judge, to vacate and supersede the commission of bankruptcy; stating that Robert Morris was then dead; that the large estate left by him was being wasted and misapplied by means of the neglect of the creditors and assignees; and that it was no benefit either to the creditors or to the bankrupt and his heirs. A rule to show cause was granted on this petition, returnable on the 26th December, 1825, and the time subsequently enlarged to the 13th January, 1826. But the petition was then no further prosecuted. On the 15th January, 1830, the application was renewed, on behalf of Henry Morris, to Judge Hopkinson, who had succeeded Judge Peters.

Mr. Williams, for petitioner.

The power of acting under the bankrupt law is given to the judge, and not to the court. Act 4th April, 1800 (1 Story's Laws, 732 [1 Stat. 19], §§ 2, 3, 14, 19, 28); Lucas v. Morris [Case No. 8,587]. And this power remains under the repealing act. Act 19th Dec., 1803 (2 Story's Laws, 909 [2 Stat. 248]), Lucas v. Morris [supra]. There is no fixed rule in

England or the United States as to the causes of superseding a commission of bankruptcy: it is an application to discretion. We do not mean to say that the district judge has in all cases the same power with the chancellor, but that he has in the case of a supersedeas. The commission of bankruptcy is considered, in England, as a species of execution, and, therefore, under the direction and control of the court by the authority of which it is issued. 2 Madd. 608, 609; Ex parte Poole, 2 Cox, Ch. 227; cited, 2 Madd. 616: Ex parte Donovan, 15 Ves. 8. After the length of time which has elapsed without any action on the part of the creditors, we are justified in supposing that they have abandoned the commission, or consented to its being superseded. Ex parte Duckworth. 16 Ves. 416. And see, also, Ex parte Proudfoot, 1 Atk. 252; Ex parte Lees, 16 Ves. 472; Troughton, v. Gitley, Amb. 630; Ex parte Wood, 1 Atk. 221; Ex parte Lavender, 18 Ves. 18.

No counsel appeared to oppose the petition.

On the 22d January, 1830, Judge HOPKINSON ordered that special notice of the application should be given to John H. Huston, the petitioning creditor; and a public notice, in the Gazette, to all creditors of the bankrupt, that the judge would proceed to hear and decide upon the petition on the 19th February. On that day proof was made that the notices, respectively, had been given in conformity with the order. The application then rested till the 17th September, 1830; and, on that day, no opposition having been made, it was ordered, "that the commission issued in the case be vacated and superseded, according to the prayer of the petitioner."

In March, 1791, a judgment was obtained by Joshua B. Bond against Robert Morris, and a testatum fi. fa. was issued thereon on the 1st February, 1798. Mr. Bond having died, his administrator issued a scire facias, to the use of William Rawle, against the representatives of Robert Morris, on the 1st April, 1830; and on the 6th December, 1830, judgment was confessed on the sci. fa. by the attorney of Robert Morris's representatives; a fieri facias was then issued and levied on certain lands, now in Schuylkill county, which were sold in October, 1831, under a venditione exponas to William Rawle, Jr., Esq., for $5,100.

On the 8th December, 1836, a petition was filed by William Sansom, praying that the supersedeas might be revoked. The petitioner set forth, that he was a creditor of Robert Morris, by a judgment, upon which there was due the sum of $9,484 12, with interest from the 23d December, 1805, and also by another judgment obtained by John Dunwoody, for a large amount. He recited the commission of bankruptcy against Mr. Morris, and his certificate of discharge, and said he had learned that a supersedeas had lately been granted, but that he had not been able to learn upon whose application, or upon what grounds. He represented that no notice was given to him,

or, as far as he could learn, to any other creditor, of the application for the supersedeas; that he had a considerable interest in proceeding under the commission; and that he was advised, that if the power existed to take it away, it could not be exercised without due notice, and an opportunity to be heard. The affidavit verified the petition, particularly as to his having had no notice of the application for the supersedeas.

The case came on to be heard on the 30th December, 1836, before Judge HOPKINSON, and was argued by Mr. Wharton for the petitioner; and by Mr. Williams, who appeared for Henry Morris; Mr. Tilghman, who appeared for Wm. Rawle, Jr., Esq.; and J. S. Smith, who appeared for the representatives of Robert Morris, against the petition.

Mr. Wharton, for the petition.

There is no bona fide purchaser without notice, who has paid money for his purchase, whose rights will be affected by granting the prayer of the petitioner; but, if there was such a purchaser, as the proceeding of supersedeas was without the jurisdiction of the judge, the purchaser is not entitled to the same protection as if he had purchased under a judgment in a court of law, of which all must take notice. It may be urged that the petitioner is not entitled to be heard, because the debt on which he claims is to be presumed to be paid, on account of the time which has elapsed since it was last prosecuted. It is true that after a certain period of time payment will be presumed on bonds, judgments, &c., but this is not a presumption overruling all objection, like that of cases within the statutes of limitation; it arises from circumstances, and may be repelled by other circumstances; and whether it is or is not so repelled is a matter for a jury to decide. 2 Starkie, Ev. 270, 824; Foulk v. Brown, 2 Watts, 209, 215; Summerville v. Holliday, 1 Watts, 507; Nickle v. McFarlane, 3 Watts, 165. And in this case the payment or non-payment is a question of fact for a jury under the 52d and 58th sections of the act of 4th April, 1800 (1 Story's Laws, 732; [2 Stat. 19]). The petitioner has four reasons to urge against the presumption;—the bankruptcy of Mr. Morris; his death; the difference between a judgment and a bond, non-payment of interest on a bond being strong ground for presuming the principal to have been paid; and the fact of the existence of property in Schuylkill county being unknown till recently. It may also be objected that the petitioner never proved his debt under the commission, but the objection is of no weight, as a creditor may prove at any time. Archb. Bankr. (5th Ed.) 124. We deny that such authority as is here claimed is vested in any judge exercising the powers given by the bankrupt law. All the power of this court, in bankruptcy, is derived either from the act of congress, or, by necessary inference, from the English system. The moment the party was declared a bankrupt the power to issue a

supersedeas was lost, and there is no hint in the act of any such authority as has been here exercised, to deprive the commissioners of the property vested in them. Act 4th April, 1800 (1 Story's Laws, 732 [2 Stat. 19] §§ 3, 5, 8, 10, 11, 36, 45); Act 19th Dec., 1803 (2 Story's Laws, 909 [2 Stat. 248]). There is not a syllable of authority in England or America to supersede the commission, under such circumstances, after the certificate of discharge. A bankrupt law is to be construed more favorably to a creditor than an insolvent law, yet there is no supersedeas under the insolvent law. Power v. Hollman, 2 Watts, 218. The district judge has not the same power to supersede as the English chancellor. Lucas v. Morris [Case No. 8,587]. The refusal of the assignees to act did not revest the property in the bankrupt, but it remained in the commissioners. Willis v. Row, 8 Yeates, 520; Gray v. Hill, 10 Serg. & R. 436; Wickersham v. Nicholson, 14 Serg. & R. 118; Cookson v. Turner, 2 Bin. 453. There can be no equity shown for issuing the supersedeas; and the petition of Henry Morris for that purpose, together with the reasons assigned in it, is totally unprecedented.

Mr. Williams, against the petition.

The property is not vested in the commissioners, but remains in the bankrupt until the assignment. Doe v. Mitchell, 2 Maule & S. 446; Carleton v. Leighton, 3 Mer. 667, 672. There never has been any assignment; the instrument remained with the clerk of the commissioners, and the property with the bankrupt. It would be inequitable to revoke the supersedeas now, when third parties have acted on the rights it gave them.

BY THE COURT.—If the property remained vested in the bankrupt and his heirs, how could the supersedeas affect it; or affect those who had acquired a right to it, under him or his heirs?

Mr. Williams.—Although the legal estate was in the bankrupt, the beneficial interest was in his creditors, and would pass to the assignees when duly appointed and accepting. It is now as much too late for this application as it is for a writ of error or a bill of revivor in the matter. The San Pedro, 2 Wheat. [15 U. S.] 132, 137; 9 Pet. [34 U. S.] Append. 771, 782; Ex parte Roffey, 19 Ves. 468. And Mr. Sansom, being neither a party nor a privy, has no right to make it. The debt on which the application is founded is barred by lapse of time, and could be resisted before a commission. Diemer v. Sechrist, 1 Pa. [1 Pen. & W.] 420; Power v. Hollman, 2 Watts, 218; Dewdney's Case, 15 Ves. 479; Cope v. Humphreys, 14 Serg. & R. 15; Nickle v. M'Farlane, 3 Watts, 167; Giles v. Baremore, 5 Johns. Ch. 545. As Mr. Sansom did not prove under the commission, he had no right whatever to any kind of notice. Ex parte Smith, 1 Glyn & J. 257; Alderman Backwell's Case, 1 Vern. 208; Ex parte Duckworth, 16 Ves. 416. The supreme court having adopted the English chancery rules, in the absence of oth-

ers, the district judge should carry acts of congress into effect on the same rule and principle. Supposing Mr. Sansom had a right to be heard, has the judge exceeded his power in granting the supersedeas? If such a power did not exist, the difficulties would have been insurmountable, in the numerous cases and circumstances which would have arisen under the act, had it remained in force. In almost every case under the law, the district judge is put in the place of a chancellor with the same power that he has in bankruptcy, at least as to all powers necessary to carry the act into effect. A commission of bankruptcy is called here, as in England, a species of execution; and the authority which issues an execution has control over it and superintends it. No statute in England gave power to the chancellor to supersede a commission till the reign of Wm. IV.; it has always been an incidental power of the authority issuing the commission. Ex parte Freeman, 1 Ves. & B. 40, 41; Ex parte Matthews, 3 Atk. 816. All the books on bankruptcy show that the power to supersede a commission has never been doubted as an incidental power. When congress passed this act, they must have known of the construction which carried this power with it, and, using the same language, must have intended to allow the same construction. Lucas v. Morris [Case No. 8,587], decides that the district judge has not all the powers of the chancellor. To this we agree, but we contend that he has all the ordinary powers; he is continually exercising them; the petitioner himself asks an issue in this case, when an issue is only specifically allowed in three cases under the act of 4th April, 1800 (1 Story's Laws, 732, §§ 3, 28, 52 [2 Stat. 19]) and the petition does not come within one of the cases where an issue is allowed. Granting an issue, a supersedeas, or a bill of review, is an ordinary exercise of chancery power by the district judge, without express authority. There never has been a system of bankruptcy without a power of superseding, and, if it is not in the district judge, where is it? If there is no power of superseding the commission, the estate may be wasted and mismanaged to the end of time without any remedy.

It is objected that, even if the judge has the power, the fact of the bankrupt having obtained his certificate should have prevented the issuing a supersedeas. We can show cases where a supersedeas has been granted in England after certificate; and, as the objection concedes the power, this becomes merely a question of expediency. 2 Madd. 616; Ex parte Poole, 2 Cox, Ch. 227; Ex parte Moule, 14 Ves. 602. If the object of the commission has not been and cannot be answered, like an execution, it will not be permitted to stand. The debts originally proved against Mr. Morris amounted to three millions of dollars, but, by the neglect of the commission, they amount at this time to nine millions; a great injustice to the bankrupt, and an end

very different from that intended to be reached by the appointment of the commissioners. Laches alone is a sufficient ground for superseding a commission. Ex parte Proudfoot, 1 Atk. 252; Ex parte Lees, 16 Ves. 472; Troughton v. Gitley, Amb. 630. And commissions have been superseded for the benefit of the bankrupt. Ex parte Wood, 1 Atk. 221; Ex parte Lavender, 18 Ves. 18.

Mr. Tilghman, on the same side.

Mr. Sansom must be considered as having been present at the time of the application of Henry Morris, and as not objecting when the supersedeas was granted, for the whole system of notice in bankruptcy, both here and in England, is such as was followed by the judge. Notice in the Gazette is all that is required. The same sort of notice is given to creditors who have judgment or mortgage on land sold by the sheriff; if they do not come in on that notice they lose their priority, as is also the rule in the orphan's court. Mr. Rawle has acquired rights on the faith of the supersedeas, and we protest against its validity being questioned now, especially by a person in Mr Sansom's position. Cope v. Humphreys, 14 Serg. & R. 15. If no supersedeas had been ordered, the commission of bankruptcy, being but a statutory execution, and no proceedings having been had under it for so long a time, this torpidity would divest the commissioners and assignees of the property, and the commission with all rights under it would expire by the lapse of time. The heirs of Mr. Morris could have recovered their lands in England had there been no supersedeas. Mr. Sansom and all the other creditors are to be presumed to have been paid, from the lapse of time, and payment is a sufficient ground for supersedeas in all cases. The act of 4th April, 1800 (1 Story's Laws, 732 [2 Stat. 19]), using the same words, must have been intended to give the same powers as the English statute.

J. S. Smith, on the same side.

This petition is unprecedented and anomalous. It is an application to a judge to reverse his own decree because he had no power to make it. If the judge had no power to order the supersedeas, it is void, the commission still exists, and this application is unnecessary. All powers given to the judge by the bankrupt law are of a judicial character. The power to issue the commission is confined to a judicial officer, and judicial power to issue implies power to control, refuse, or supersede the commission, for it is in the nature of an execution; and when power is given to a judicial person to issue an execution, it is an incident to the power that he may set the execution aside. The power of the chancellor under St. 13 Eliz. c. 7, § 2, is given to him in the same words as the power given to the judge by the act of 4th April, 1800, § 2 (1 Story's Laws, 733 [2 Stat. 19]). There is no power to supersede given to the chancellor by the English acts which is not given to the judge by our act. The English statutes give an express power to supersede in but two cases. St. 5 Geo. II. c. 30, § 24; Act 4th April, 1800, §§ 3, 28 (1 Story's Laws, 733, 741 [2 Stat. 22, 28]). The chancellor has no power in bankruptcy but what is derived from the acts of parliament, and when he supersedes, it is by virtue of the discretionary or incidental power given to him by those acts, in other cases than are therein expressly mentioned. 2 Madd. 609; Ex parte Freeman, 1 Ves. & B. 40; Ex parte Lund, 6 Ves. 782; Phillips v. Shaw, 8 Ves. 250. If the judge can supersede only in the cases specially mentioned, the commission might be perpetual, though fraudulent or collusive, and though all parties consented to the supersedeas, or the debts had been all paid. Very many judicial powers are given by the statute and exercised by the judge. Act 4th April, 1800 (1 Story's Laws, 732 [2 Stat. 19], §§ 2, 3, 19, 36, 47, 51, 52); U. S. v. Lawrence, 3 Dall. [3 U. S.] 42. It can only be inferred from Lucas v. Morris [supra], that the district judge has not exclusive jurisdiction over the entire execution of the bankrupt law, as the chancellor has in England; and the only point positively decided by the case was that the judge could not call the assignees to account. See Ex parte Cowan, 3 Barn. & Ald. 123. If the district judge acts judicially in bankruptcy, and the chancellor has no greater power under the acts of parliament than the judge under the act of congress; we may take the acts of the chancellor as a precedent. The power of the chancellor to grant a supersedeas appears to be conceded, except where a certificate has been issued. But a supersedeas has been granted after certificate. Ex parte Poole, 2 Cox, Ch. 227; Ex parte Moule, 14 Ves. 602. Where it has been refused after certificate, it has been for the benefit of the bankrupt, in order that, after conforming to the law, he shall not be exposed to the effect of his debts by superseding the commission and all that has been done under it; Ex parte Leaverland, 1 Atk. 145. If the judge has power to supersede, and has superseded, why should he now revoke it? The whole argument and inquiry now is as to the effect of the supersedeas upon certain lands in Schuylkill county, since purchased by a third party. Mr. Sansom has no right to ask that the supersedeas shall be revoked merely to let him in to prove his debt after he has had nearly thirty years to come in and has not done so, although living in the city where the commission sat. His interest in the property now discovered is but one-ninth of one per cent.; so trifling a proportion that it cannot be supposed he will seriously prosecute his claim, even if the commission should be reopened. The petitioner denies the judge authority to order a supersedeas, but asks him for a procedendo, when both powers must come from the same source. If a procedendo should be ordered, justice requires that it should be upon terms, so as not to affect rights acquired under the supersedeas.

Mr. Wharton, in reply.

We deny that the judge had power to grant the supersedeas. Jurisdiction and power have different meanings: the first has a general scope or bearing, the second is something that exists within the first. A general jurisdiction implies the power necessary to execute it. If the judge had general jurisdiction in bankruptcy, all general powers would exist within that sphere; but if the jurisdiction is given by statute, and is limited, then no power can be implied. In England there is no statute giving power to the chancellor; the first rise of his authority is unknown, but it is now as large as the whole broad and sweeping chancery jurisdiction. and of it his authority in bankruptcy is part. Wright v. Simpson, 6 Ves. 732; Eden, 449, citing Anon., 14 Ves. 451. The English bankrupt laws are framed with a view to the authority of the chancellor in the exercise of his ordinary jurisdiction. Ex parte Bradley, 1 Rolle, 202. But no such power or jurisdiction is given to the district judge; the district court has no equity jurisdiction but in granting injunctions.

BY THE COURT.—In the cases in 14 Ves. and Rolle, just cited. the chancellor did not claim the power he then exercised by virtue of his chancery jurisdiction, but by the interpretation and construction of the statutes of bankruptcy. He derives all his authority from the statutes and the inferences from them.

Mr. Wharton.—By confiding the execution of the bankrupt laws to the chancellor it was a reasonable inference that it was intended he might use his powers as chancellor to carry the laws into effect. But if the execution of the statutes had been confided to a common law judge, no such inference could have been drawn. The district judge here has no such powers as the chancellor, and, of course, the act of congress in referring to the district judge, intended only to let him exercise the powers in bankruptcy that he had in his ordinary jurisdiction; Lucas v. Morris [supra]. It is true that the judge has certain judicial powers under the bankrupt law, but they are limited, and cannot be extended beyond those limits. Even if the power of the district judge is commensurate with that of the chancellor, the chancellor himself is without power to grant a supersedeas in a case like the present. The fact of its being without precedent in the innumerable English bankruptcy cases is proof that the power does not exist. The chancellor would require the express affirmative. consent of the creditors, both those who had proved and those who had not, before he would supersede a commission. 1 Mont. Dig. Bankr. 366, 369. The assent is assumed here, but such consent can only be shown by a writing signed by the creditors. and praying for the supersedeas. And consent cannot be implied from the mere fact of publication. 2 Mont. Dig. Bankr. 313. The real ground assigned for the supersedeas is not the consent, but the neglect, of the creditors. A totally unprecedented ground. It is contended that the legal interest has never been out of the bankrupt; but our law is different in this respect from that of England. St. 34 & 35 Hen. VIII. c. 4, § 1; 13 Eliz. c. 7, § 2; 5 Geo. II. c. 30, § 37; Act 4th April, 1800 (1 Story's Laws. 732 [2 Stat. 19], §§ 5, 50). Both the legal and beneficial interests were in the commissioners, so continued if the assignees did not accept, and so continue, unless—inconsistently with law—they have been divested thereof by the supersedeas. It is not too late to make this application, as a bill of review will lie at any time within twenty years. 2 Smith, Pr. Eq. 50. It is alleged that there is a purchaser for a valuable consideration, on the faith of the supersedeas. The person claiming this position should show affirmatively that he has actually paid a valuable consideration in money, it not being sufficient if the judgment creditor has allowed a credit on the judgment for the amount of the purchase-money; and the party claiming as an innocent purchaser should also show that he had no connnexion with the petition for a supersedeas, and that he was ignorant of its invalidity. Harrison v. Southcote, 1 Atk. 538; Hardingham v. Nicholls, 3 Atk. 304.

HOPKINSON, District Judge. On the 28th day of July, 1801. a commission of bankruptcy was issued by the district judge for the Pennsylvania district. against Robert Morris, directed to John Hallowell, Joseph Hopkinson. and Thomas Cumpston, commissioners. The bankrupt being duly summoned, surrendered himself to the commissioners, and submitted himself to be examined; the commissioners having previously declared the said Robert Morris a bankrupt. On the 6th day of August the commissioners received proof of sundry debts. On the 26th of August proof of debts was received from about twenty-one creditors, and the choice of assignees postponed until the 12th day of September. On that day further proofs of debt were received from nearly forty of the creditors of the bankrupt. At several subsequent meetings of the commissioners proofs of debts were continued to be received, amounting in the whole to upwards of ninety, and whose aggregate amount of debt was about three millions of dollars. On the 8th day of December, 1801, the commissioners executed an assignment of all the estate and effects of the bankrupt to John R. Smith, Esquire, and John Craig, and Nathan Field, merchants, they being the assignees chosen by the creditors. Here the proceedings by and before the commissioners stop. The assignment still remains among the papers of the commission, never having been accepted by the assignees. nor any counterpart executed by them. No attempts were made by or on the part of the creditors to call upon the assignees to execute the trust, nor to have

other assignees appointed to supply their place and take charge of the estate and effects of the bankrupt. It may be here remarked that the petitioner now before me made no proof of his debt before the commissioners, or took any part in the proceedings under the commission. The estate and effects of the bankrupt, whatever they were, were thus abandoned by the creditors; not only by those who had proved their debts, and neglected or declined to use the rights they had under the commission, but by those also who by not proving, exhibited even more indifference to his affairs. It cannot be believed, indeed it is not pretended that the petitioner, being in the city where these proceedings were going on, was not acquainted with them. At all events, he had the notice which the law required, and which was given to the creditors of the bankrupt generally.

Things remained in this situation, in a state of absolute inaction, and without any symptom of a revival, until the month of November, 1825, that is twenty-four years, within a few days. In the mean time, that is, in the month of ——, 1806, Robert Morris, the bankrupt, died. On the 21st day of November, 1825, Henry Morris, one of the children of Robert Morris, presented his petition to the Honorable Richard Peters, then judge of the district court of the United States, for this district, the same who had issued the commission, in which he recites the proceedings under the commission, and alleges that the assignees do not appear ever to have accepted the trust; nor have they executed any counterpart of the assignment; nor has there been, as he believes, anything further done in the premises. He states that the said Robert Morris, died in 1807 (1806), leaving a widow and five children, whereof the petitioner is one. He then alleges and sets forth, "That at the time of the said bankruptcy, the said Robert Morris was seized and possessed of a large estate, real and personal, which, in consequence of the neglect of the said creditors and assignees, in not duly prosecuting the said commission, has been wasted and misapplied, without benefit to the creditors or to the bankrupt." This allegation has not been disproved, nor as I recollect, denied to be true, from that time to the present. It is the ground and reason on which the petitioner, Henry Morris, prayed the district judge "that the said commission of bankruptcy may be vacated and superseded." This petition, as appears by an endorsement on it, was read, filed, and a rule granted to show cause, &c., returnable on 26th December, 1825. On that day the rule was enlarged till 13th January, 1826. No further proceeding was then had, for reasons which do not appear, nor does it appear to whom the rule to show cause was directed, nor that any service of it was made. On the 15th of January, 1830, the application on behalf of Henry Morris, was renewed to me; and Mr. Williams was heard as the counsel for the petitioner. No counsel appeared to oppose it. On the 22d of the same month, I ordered, that notice of the application be specially given to John H. Huston, the petitioning creditor; and a public notice, in the National Gazette, three times a week for two weeks, to all the creditors of the bankrupt, that the judge will proceed to hear and decide upon the petition on Friday, the 19th of February, 1830. On that day proof was given that the notices, respectively, had been given in conformity with the order. The application then rested until the 17th of the following September, during the whole of which time it cannot be doubted, that any application or argument, in opposition to the petition, would have been attended to. On the 17th of September, no opposition being made, either by the creditors who had proved under the commission, or by any other person claiming to be a creditor, or to have any right or interest in the estate of the bankrupt—the order was made "That the commission issued in the case be vacated, and superseded, according to the prayer of the petitioner." How far these proceedings were known to the creditors of Mr. Morris by the public notice given to them, I cannot say; Mr. Sansom, in a way which has not been satisfactory to the opposite counsel, has denied a knowledge of them, or rather as they say, that he had notice of them; perhaps this criticism is rather too close and verbal, as it would involve Mr. Sansom in an equivocation equal to an untruth, under his solemn affirmation, which ought not to be imputed to him, without a more satisfactory demonstration. The proceeding on the petition of Henry Morris, was not hurried. It was pending nearly five years. If in that time it was known to Mr. Sansom or any other of the creditors of Robert Morris, it was also known to them in law if not in fact, for the petition was open to them, that the application for the supersedeas was made on the ground that Robert Morris was possessed of a large estate, which in consequence of the neglect of the creditors and assignees, was wasted and misapplied; and it was also clearly understood, for otherwise the supersedeas would be fruitless, that something remained to be redeemed from the neglect by which so much had been lost, and which, if redeemed, would enure to the benefit of the creditors, if they would look after it; or to the family of Mr. Morris, if the creditors by abandoning it would suffer it to return to the representatives of the bankrupt, by superseding the commission. The effect of the supersedeas, if lawfully ordered, was to annihilate the commission, and to place the bankrupt with his estate and effects in the same situation they would have been in, had it never existed. He, or, in this case, his representatives, were fully restored to all their rights over his property, and resumed the management, control, and disposition of it. So they remained, unquestioned and undisturbed, until the 8th day of December, 1836—a period of more than six

years. On that day the petition of William Sansom was filed, followed by his affidavit, on the 15th of the same month. The petitioner states that he was a creditor of R. Morris, by a judgment, upon which there are due the sum of $9,484.12, with interest from the 23d of December, 1805; and also by another judgment obtained by John Dunwoody, for a large amount. He sets out the commission of bankruptcy against Mr. Morris, and his certificate of discharge; says that he has learned that a supersedeas has lately been granted, but has not been able to learn upon whose application, or upon what grounds. He represents that no notice was given to him, or, as far as he can learn, to any other creditor, of the application for the supersedeas: that he has a considerable interest in proceeding under the commission, and is advised, that if the power exists to take it away, it cannot be exercised without due notice, and an opportunity to be heard: he therefore prays for a review of the proceedings, in reference to the alleged supersedeas, and that he may be heard by counsel in opposition to it. The affidavit verifies the petition, particularly as to his having no notice of the application for the supersedeas. I cannot forbear to remark that some of the allegations in this petition are rather singular, without meaning to say that they will have any weight in deciding upon it. The petitioner says, that although he has learned that a supersedeas has lately (six years before) been granted— he has not been able to learn upon whose application, nor upon what grounds it was done. He has not informed us how he learned that the supersedeas was granted, nor what means he took, after he was informed of it, to discover who was the applicant for it, or the grounds upon which it was granted. Certainly in the same office where he filed his petition, the petition of Henry Morris was filed six years before, and there remained, and that petition shows the ground of the application. The proceedings of the judge upon that application were filed in the same place, and were equally accessible to Mr. Sansom. It is true that he does not aver that he took any step or measure to obtain this information, unless such an averment may be inferred from his declaration that he had not been able to obtain it. The petitioner, as the ground, and, I may say, the only legal ground of his application to revoke the supersedeas, and restore the commission, alleges, "that he has a considerable interest in proceeding under the commission." It cannot be overlooked, that his interest in the commission was so inconsiderable in his own estimation, that although living in the city in which the commissioners sat, and where from time to time the creditors of the bankrupt. were appearing and proving their debts, he never, for thirty years, during the pendency of the commission, thought it worth his while to give half an hour to the proof of his debt, or to the interest he had in the commission.

How far an interest has since arisen which can assist him in this application, will be a subject of future consideration. At present I refer to these circumstances, not as impairing his legal rights, but as affecting his equity, if he shall be thrown upon that to support himself. This case is altogether one of the first impression here, and, in some of its features and aspects, without precedent in England, where so many volumes have been published upon their bankrupt laws. The counsel engaged in the argument on both sides, have given unwearied labor to their investigations, and although so many days have been appropriated to the hearing, my attention has been required and willingly afforded to every part of it. I may be tedious in developing my views of the leading matters and questions which have been discussed, but I would rather.be so, than overlook what either party may deem to be important.

The first question which presents itself, is the jurisdiction or authority of the district judge of the United States over the subject-matter of the petition of Henry Morris—that is—had he the power to grant the prayer of that petition, and to make the order to supersede the commission of bankruptcy, then in operation against Robert Morris. This question has been argued on the basis of the powers of the lord chancellor in England, under the British statutes of bankruptcy, and this inquiry was pursued in two divisions: (1) What are the powers of the lord chancellor, and from what source does he derive them? (2) Has the district judge the same powers in the execution of our act of congress, as are exercised by the chancellor? It is true that no case has been shown where the lord chancellor has superseded a commission of bankruptcy under circumstances like those of the present case; but these circumstances are really so extraordinary, that one may say they have never before occurred, and are not likely to occur again. We have here a commission taken out against a bankrupt, who was the possessor of an immense real and personal estate, laboring under incumbrances of unknown amounts. The commission proceeds so far, as that creditors having debts of three millions made the regular proofs before the commissioners. An election was duly held for assignees, and they were chosen—a large number of the creditors attending for that purpose. The assignees never accepted the trust—never executed a counterpart of the assignment, and the whole proceeding stopped. After the commissioners had executed their assignment, which was on the 8th of December, they met no more, nor was a movement made by any creditor of the bankrupt. who had, or had not, proved under the commission, to call the commissioners together, to have other assignees appointed, or to move one step further with the commission; and so it remained for five-and-twenty years, when the supersedeas was applied for; and

so that application remained for five years longer, without a stir on the part of any creditor to proceed with the commission. We cannot be surprised that no such a case has been found in England, and we must therefore look rather to the principles on which the chancellor has raised his power in cases of bankruptcy, than for any precedent like this,—creditors to the amount of three millions, taking such an interest in the commission as to go through the trouble and formality of proving their debts, attending afterwards to choose assignees to take charge of those interests, and then suddenly abandoning the whole concern, and never, to this hour, returning to it. To ascertain the nature and extent of the jurisdiction of the lord chancellor, over cases of bankruptcy, we must inquire what is the source from which he derives it, and how he has drawn his powers from that source. I think an examination of the authorities on this subject will show, that all his powers are derived from the statutes of bankruptcy; that he has none as a court of chancery—not one that he has not drawn either from the express authority of those statutes, or by the constructions and implications he has thought he might fairly make, being found necessary for the just and full execution of those statutes, to give to them all the benefit to the bankrupt and his creditors intended by the legislature, and to prevent any wrong and injustice by the abuse of them. Numerous cases have been cited, which show, that the authority to supersede a commission of bankruptcy, which is exercised without question by the lord chancellor, extends over a large field; indeed, no precise boundaries appear to be marked for it. The chancellor interferes in this way on very broad and general principles, for the purposes of justice, and to prevent an abuse of the bankrupt laws, to the prejudice of the bankrupt, as well as of the creditors. They are both under his protection, and he takes care that the true intentions of the legislature in making the statutes, as he understands them, shall be carried into effect, and shall not be perverted, either by the bankrupt, or by his creditors. to the work of injustice. This is the broad principle on which he acts, and. without any express words in the statutes, he assumes that his powers are commensurate with these objects. But as this extent of power is not expressly granted to him by the language of the statutes, it is argued that he exercises it by virtue of his general chancery jurisdiction; that he takes this authority to himself because he is the lord chancellor, and holds the great seal; and not because he is the person or officer designated in the bankrupt laws to issue the commission: in short, that he has the authority only to issue the commission, with certain other powers, by the express grant of the statute, and that his subsequent control over it, except in the cases designated, is by virtue of his office and jurisdiction as lord chancellor. I am not of this opinion; and a brief recurrence to some of the leading cases will show that it cannot be supported; on the contrary, that all and every power he exercises over bankruptcy, is derived, either expressly, or by construction and implication, from the statutes: that he has none as a chancery court, or by virtue of his office as chancellor; that the two jurisdictions are entirely separate and distinct. The jurisdiction of the lord chancellor in bankruptcy is distinct from that of chancery. 6 Ves. 782. The jurisdiction is under a special authority, distinct from that of the court of chancery. 8 Ves. 250. It is a legal and equitable jurisdiction. 15 Ves. 496. The case of Ex parte Cawkwell, 19 Ves. 233, was a petition for an order on the bankrupt to produce to the commissioners a deed of trust. The order was made by Lord Eldon, who says: "It is in many instances difficult to state precisely the principle on which the jurisdiction stands, in which a bankrupt is often ordered to do that for which there is no express authority." Now if it might have been referred to the general jurisdiction of the chancellor, there could have been no difficulty about it; nothing could be more simple; the want of an express authority would have created none. Lord Eldon then adverts to Lord Hardwicke's opinion in these terms: "It is well we have Lord Hardwicke's authority for it; who took a very large principle as to the jurisdiction in bankruptcy; thinking that the legislature having committed to the lord chancellor the jurisdiction in bankruptcy, he had all the authority that he had when sitting in the court of chancery." Well might Lord Eldon say that this was a large principle to act upon in such a case. This opinion of Lord Hardwicke has been much relied upon by the counsel for the petitioner in support of his doctrine, that the chancellor derives his extraordinary powers over cases of bankruptcy from and by his general chancery jurisdiction. I confess, it appears to me to admit of no such conclusion; on the contrary, it is the very strongest case we have, to show that he does nothing by his general jurisdiction, but that he obtains all his powers from the statutes, but has thought himself at liberty to use, very freely, his discretion in construing the statutes, in order to get, by implication, the authority he thought necessary for the purposes of justice, and the due execution of the statutes. This opinion of Lord Hardwicke is truly the most copious stream of power that the chancellor has drawn from the statutes, the acknowledged fountain of all his jurisdiction in bankruptcy; and it is so far from restricting that jurisdiction to the cases expressly granted, that it sets us an example in the use of construction and implication to obtain powers, which has no limits but the discretion of the chancellor or judge. To return to Lord Hardwicke—on what ground

does he assume the large principle which gives him so much power? Is it by his distinct independent jurisdiction as chancellor? By no means—he thought "that the legislature having committed to the chancellor the jurisdiction in bankruptcy, he had all the authority that he had in the court of chancery." This was his construction of the statute—his belief of the intention of the legislature—his inference from the language and objects of the statutes, and of consequence it is from them and from them only, that he assumes the jurisdiction. In the case in 14 Ves. 449, the question was, whether the commissioner could compel the bankrupt who had obtained his certificate to attend the commissioners. The chancellor said, "Without the existence of such a power, the mode of allowing certificates must be altered." He asserts that he has the power to compel the attendance of witnesses, admitting that there is no express authority given by the statute for that purpose. How then does he get it? Is it by his general chancery jurisdiction? By no means; but by implication; by construction of the meaning and intention of the bankrupt laws, which he says "were framed with a view to the authority with which the lord chancellor is intrusted in his ordinary jurisdiction." But the statutes do not say that they were framed with any such view, nor is there any reference in them to the general chancery jurisdiction for their execution. It is the mere inference or implication of the chancellor, as is the opinion of Lord Hardwicke, from the statutes themselves, from which, in some way, by construction more or less reasonable, the whole power of the chancellor in bankruptcy is derived. The case of Ex parte Smith, 19 Ves. 473, was a petition to supersede a commission of bankruptcy, because it was taken out by an attorney who was not a solicitor of chancery. No express power is given to supersede for this reason. The objection was overruled, not on the ground of a want of jurisdiction, but because "a commission of bankruptcy is a proceeding not in the court of chancery; and a solicitor in chancery has no more connexion with proceedings in bankruptcy, and is as much a stranger, as an attorney of king's bench or common pleas." And so is the chancellor as such. Eden, 449, quoting Mr. Christian, says, the jurisdiction of the lord chancellor in bankruptcy is "a subject involved in great obscurity and mystery." Why so, if it may be referred at once to the general chancery jurisdiction? He proceeds, "which can only be developed by attention to its history and progress, and to those general principles of the common law by which statutes are construed, and to those also which are applicable to every new commission emanating from the great seal by virtue of the authority of the legislature." The author then refers to the opinion of Lord Eldon in 14 Ves. 451, as "comprising every-

thing necessary to be known upon the subject." In Ex parte Dufrayne, 1 Rolle, Abr. 333, it is said, the chancellor will supersede, if justice requires it, although the strict law would not.

The result of these authorities seems to be that the lord chancellor, taking the language of the statutes and the intention of the legislature for his premises, determines, by a process of reasoning and deductions from them, that he has certain powers in the execution of the bankrupt laws, which are not expressly given to him, but which he believes are incidental to the power given, and may be implied from the premises mentioned, that is, the language and intention of the legislature, and not from the great seal. Has the chancellor a broader discretion in the construction of a law, which he is called upon to execute, than the district judge in the same situation? They must both take the statute for their guide and authority as they consciously understand it. The British acts have named the chancellor as the person or officer who is to issue the commission and hold other expressed powers. Any other person or officer might have been named, and his powers would have been the same, provided the words of the statute would have afforded the same construction or implication. With us the district judge issues the commission, and has other express powers, and he has also all the powers which he may deduce by a fair and legal construction of the act of congress, and the intention of the legislature in framing that act. The sound and tenable reasoning on the subject appears to me to be this. Cases must occur in which justice to the bankrupt, justice to his creditors, the rights and interests of both, the whole scope and spirit of the bankrupt system, will require, that a commission issued ought to be revoked and superseded: that its continuance would afford a benefit to no one, would injure many, would countenance injustice, perhaps fraud. Can it be then that, because the act of congress has no enumeration of such cases, no special provision or grant of power, to prevent or arrest these evils, there is therefore no remedy for them, there is no authority over them? Such a presumption is insufferable. Where then should we look for the authority to perform this act of justice? To whom must we presume it was intended to be intrusted? Who is to recall the commission?—the authority which is thus abused, which every one must agree ought to be recalled by somebody? The answer would seem to be, that the jurisdiction which issued the commission ought to be, must be, in the absence of any other,—and no other exists,—that which shall revoke it. That the judge to whom the power is given to issue the commission has also the power to recall it, if, instead of answering the purposes for which it was issued, it is used as an instrument of fraud, of oppression, of injustice, for the destruction of the property and rights it was

intended to preserve, without producing one of the benefits expected from it. If the judge should supersede, where he ought not to have done so by a false or forced construction of the law, taking by such means a power which he was not entitled to, the act will be a nullity; and any party injured by it can obtain ample redress. But if he has no authority to supersede his commission, the mischief will go on; and I know of no remedy for it. To apply this remark to the present case: if, as has been contended on the part of the petitioner, the supersedeas was ordered without any authority,—if the judge exceeded his jurisdiction in making the order,—it is obviously a nullity; it does not stand in the way of the rights or remedies of Mr. Sansom, or any other person, creditor or not a creditor, having proved or not having proved under the commission; but the commission, and every right and remedy under it, now stand in as full life as on the first day of its existence. Why does not the petitioner proceed as if the supersedeas had no existence? If his judgments will avail him in any way, or to any purpose, the supersedeas opposes no impediment to their operation. If, by lapse of time, or other means, he can have no proceeding by his judgments against the lands, which now seem to be the object of his pursuit, or against any other property of the bankrupt, then the revocation of the supersedeas would afford him no aid against that difficulty; it would not better his situation in the smallest degree. The supersedeas, on his argument of its invalidity, does not stand between him and these lands, or impair his remedies against them. If he has lost them, it is not by a void supersedeas. What course may he take if the supersedeas were revoked, according to the prayer of his petition? He may proceed under the commission, have new commissioners appointed, assignees chosen, the property of the bankrupt, wherever found, taken possession of and distributed among his creditors. What hinders his doing all this now, on the supposition that the supersedeas was unauthorized and is void? On this view of the case, on this ground for revoking the supersedeas, he has no interest in revoking it, because it works no injury to him or his rights. Nor can the holders of the new warrants, which, it is said, have been laid on the lands, —a part of them in Schuylkill county,—derive the least advantage from the removal of the supersedeas, be it valid or invalid. They may bring their ejectments. If the supersedeas be good and valid, they will have to encounter the title of Robert Morris, and no other; for the lands were sold as his property, and the purchasers hold them only by his title. If the warrant-holders show a better one, they will recover. On the other hand, if the supersedeas be ineffectual and void, still, the warrant-holder must meet and overthrow the same title of Robert Morris, for his creditors will defend under that title. The result then is that, whether the petitioner intends to pur-sue these lands under his judgments, or by the new warrants, in which he denies having any interest, or by proceeding with the commission, the supersedeas—if, as he contends, invalid—will put no difficulty in his way; and he may have its validity tried by any court of competent jurisdiction he may select.

Before I leave the question of jurisdiction, I must not omit to notice the case of Lucas v. Morris [Case No. 8,587]. A bill was filed in the circuit court of the United States, calling upon the defendants, as trustees, to account, and to compel them to carry into execution the trust which they had assumed as assignees of a bankrupt. One of the defendants pleaded in abatement to the jurisdiction of the court, alleging that the matters and causes of complaint belonged exclusively to the judge of the district court. Judge Thompson, of the circuit court, said that, if the bill embraces any matter of which the circuit court had cognizance, the plea must be overruled; for it claims for the district judge the sole and exclusive jurisdiction of all matters comprised in the bill. The judge says that he cannot discover that the act of congress has given "exclusive jurisdiction to the district judge over the entire execution of the law." Certainly it does not; nothing can be more manifest; and it is equally clear that, in the matter in question before the court, the act of congress did not, either expressly or by any reasonable implication, give the jurisdiction to the district judge, much less a jurisdiction entirely independent of the ordinary powers of courts of justice. It was claimed on the broad ground that the district judges were the sole organs to administer the bankrupt law. Now, there is a wide difference between the powers of the lord chancellor and our judges in this very matter of control over the assignees. In England the choice of assignees is subject to a control, the largest, most general, and unqualified, of any of the authorities given to the lord chancellor in bankruptcy. By the thirty-first section of St. 5 Geo. II. c. 30, the chancellor may remove assignees and appoint new ones; and this control over them carries with it the authority to compel them to account; —a refusal would be a good ground for their removal. By the eighth section of our act of congress, the power of removing assignees, and appointing others, is expressly delegated to the creditors, and excludes every implication of that power, or of any power incidental to it, in the district judges. No inference, then, can be drawn from anything that was said or done by Judge Thompson in the case of Lucas v. Morris [supra], that the district judges possess no powers over the execution of the bankrupt laws but such as are expressly given to them; nor even that they have not the jurisdiction of the lord chancellor, except where it is clearly limited by the provisions of the act of congress. To revert for a moment to the "large principle" of Lord Hardwicke, sanctioned in a manner by Lord

Eldon, the argument (for it is but an argument), founded on the statutes, that, because the lord chancellor is named to issue the commission, &c., he may therefore bring his whole chancery jurisdiction into the execution of these statutes, is no better than to say that because the district judge is named in the act of congress for the same purposes, he may exercise all his judicial authority in the administration of that act; and then, by invoking the analogy, so often repeated, between commissions of bankruptcy and executions, the power of the judge will be ample enough. With great deference to such high authority, it appears to me that neither the chancellor nor the judge have any jurisdiction over bankruptcy, virtute officiorum, but obtain it directly from the statutes, by express grants, or by incidents to those grants drawn from the statutes "by those general principles of the common law by which statutes are construed." Eden, 449. Whether a district judge, in his discretion, would feel authorized to draw as largely on this fund as the lord chancellor has done, is another question. Whatever power they rightfully have is by virtue of the statutes, and not by virtue of their offices.

Some authorities have been cited to show that even in England it is too late for a supersedeas after the bankrupt has obtained his certificate. I think this principle has not been sustained. It is manifest that the power of the chancellor over the commission continues after the certificate, from the orders he has repeatedly made upon the bankrupt, witnesses, &c. It is true that Lord Eldon says, as quoted by Eden, 434, citing Ex parte Crowder, 2 Rolle, 324, "that he never knew an instance in which a bankruptcy was superseded after the bankrupt had obtained his certificate, on an objection to the debt, trading, or act of bankruptcy." This limitation of the objection to these objects affords some implication that it extends no farther; and we see a good reason why, after the proof of the debt of the petitioning creditor, the trading, and act of bankruptcy by the bankrupt, have been acquiesced in, until he has obtained his certificate, he shall not be deprived of it by objections to them. Eden, pursuing the subject, says that "it has been determined that a commission will not be superseded after the certificate allowed, unless the invalidity appear on the proceedings." For this he cites Ex parte Levi, Buck, 75. By turning to the case, it will be found that it is so far from changing the ground taken by Lord Eldon, that it is merely confirmatory of it, and by no means sustains this author in his general allegation that a commission will not be superseded after certificate allowed unless the invalidity appear on the proceedings. The case was, "a bankrupt had obtained his certificate, and then the petition to supersede the commission was presented, on the ground that he was not a trader within the meaning of the bankrupt laws; and that the

commission was a concerted one." The vice chancellor decided that "unless it appears upon the face of the proceedings that the party declared a bankrupt is not a trader, the petition is precluded from going into evidence to disprove the fact of trading, without he can show that the commission was fraudulent." On this decision, being one of the special cases put by Lord Eldon, Mr. Eden has raised the general proposition, that "a commission will not be superseded unless the invalidity appear on the proceedings." In Ex parte Bass, 4 Madd. 270, the same doctrine is given in the same restricted terms. The bankrupt will not, after having obtained his certificate, be allowed to impeach the commission, upon the ground that he was no trader; but he was permitted to supersede the commission, after certificate, where the title of the assignees had been successfully opposed in an action, and the commission, therefore, becomes inoperative. In the same sweeping way, Eden lays it down, that "where a bankrupt has submitted to his commission for a considerable length of time, he cannot petition to supersede it." For this he cites Flower v. Herbert, 2 Ves. Sr. 326. This was not the case of a petition for a supersedeas, nor for anything that has any analogy to it. It was a motion for an injunction to stay proceedings in an action at law, brought by the bankrupt against his assignees. It was an action of trover. The bankrupt had surrendered; had submitted to an examination; he had himself petitioned for new assignees; and a year and a half after these admissions that the proceedings under the commission were right, he brought an action of trover against the assignees, denying that he was a bankrupt. The chancellor said, that no one would accept to be an assignee, if they were to be exposed to such suits by the bankrupt, notwithstanding his acquiescence. This was no petition for a supersedeas on behalf of the bankrupt, but a prayer for an injunction against him, in a suit he had brought, under such circumstances, against his assignee. It seems to me that the power and practice of the chancellor over bankruptcy, in all its stages, before and after the certificate, are not confined to any specified cases, but are exercised whenever, in his sound and judicial discretion, he finds his interference right and necessary, to carry into effect the due execution of the statutes, according to the intention of the legislature, and to prevent any abuse of them for the purposes of fraud, oppression, and injustice.

It is manifest from the course of my remarks, that if I were compelled to pronounce a decision upon the question of jurisdiction, I should, as now advised, sustain it as a necessary power for the just administration of the bankrupt law, according to the intention of the legislature, and to prevent great abuses and mischiefs which might exist if it could not be exercised. I think, however, that I am not now called upon to express any more

absolute opinion upon this point. Were I to yield to the argument against the power of the judge to order his supersedeas, it would, of itself, be a sufficient reason for refusing the prayer of the petition. Why should I do that which will be of no benefit to him; which will add nothing to his rights or remedies? Why should I oppose an inefficient, useless revocation, to an inefficient, powerless order? I should not have the reluctance or hesitation of a moment to recall an error which would restore to a suitor any right of which the error had deprived him; but I should be unwilling to spread upon my records contradictory decrees, for no beneficial purpose or end to anybody. The chance of the petitioner, so far as he considers the success of the prayer of his petition to be important, is better, by admitting the power of the judge to order the supersedeas, and showing that the case was not one in which the order ought to have been made, and probably would not have been made, with a knowledge of all the circumstances. I will, therefore, proceed to examine the case on the supposition that the judge had authority to order the supersedeas; and the question then will be, whether the petitioner has shown good cause for revoking it.

In this view of the case the petitioner must put himself upon his equity, as opposed to the equity of those who resist his application. At his first step he must meet and overcome the objection to his application in the character of a creditor of Robert Morris, after having forgotten or disregarded it for so many years. The peace of society, the settled condition of property, are cardinal objects of every government. To preserve them the legislature, in some instances, by positive enactments, and, in others, the courts, by their judicial, discretion, have raised barriers against stale and neglected claims, which may not be passed, whatever the rights may be that are excluded by them. Such are the limitations of time upon writs of error, bills of review, &c. I shall not hold the petitioner in this case to be interdicted from a hearing, even by the extraordinary number of years that have passed away, before he made a movement for the assertion of his claim, but consider the delay only as it affects his equity under all the circumstances of the case: I do not speak of his inattention to the proceedings for obtaining the supersedeas—he says he had no notice of them—but of his inattention to the commission, of which he certainly had notice and knowledge, and to reinstate which is the object of his present application. For thirty years he thought the commission of no importance to him; he had no right of interest in it or under it which, in his opinion, was worthy of his attention; and now he seeks, on the ground of that right and interest, to bring back this commission to existence. We may certainly say, that he must be prepared to show strong reasons for such an indulgence. I do not say

that this neglect of the claim he now urges upon me has shut him out from a fair consideration of his case. I have heard him—he has been faithfully and ably defended, and I shall endeavor faithfully, at least, to do him justice, not overlooking the justice that may be due to others. I must here recur to his conduct during the progress of the commission. He saw the whole proceeding entangled, and finally stopped, by impediments he could have removed at once, but he stirred not. Having securities which put him in a better situation than other creditors, he let them struggle in endeavors which he thought would be fruitless, while he declines to share the labor, or put one dollar at hazard in the attempt. After a lapse of many years, the family of the bankrupt discover some property, or some interest which he had in property, which was going to waste and ruin, because there was nobody to attend to it. The creditors, and the petitioner among them, had for five-and-twenty years abandoned the whole concern, and there was no power in the family of the bankrupt, or in anybody, to make them or him return to it. What was to be done? Was the property, whatever was its value, to be lost, for want of an owner? If the creditors would not have it, if Mr. Sansom rejected all interest in it, should it not revert to the party who had assigned or tendered it to them, provided there was a power in the law to return it to him? Why did Mr. Sansom disregard, for so many years, the commission he now thinks of so much value to him? It was known to him—he was called on again and again to appear with his claims as a creditor before the commissioners. He did not—he would not appear. Nobody knew, officially, that he was a creditor—that he had any claims upon the bankrupt, or his effects—any interest in what was doing under the commission, or what might finally be done with it. After a lapse of twenty-five years, he wakes up—he comes forth from his obscurity, and presents himself here as a creditor of Robert Morris, having an interest in the commission of bankruptcy, which entitles him to the favor of the judge, by the revocation of an order deliberately made, in relation to that commission. He asks that this order may be expunged or revoked, in order that he may be allowed to enrol himself under the commission as one of the creditors of Robert Morris, for no other creditor asks for it; he now wishes to prove his debt before the commissioners, and to reinstate the commission with all its legal rights and consequences. He seems to be either one of the sleepers for whom the law will not watch; or one of the watchers who look quietly upon the labors of others without sharing them, but keep themselves ready to seize upon any benefit that may result from them. What reasons has the petitioner offered to justify or explain his long inaction in relation to his rights and interests as a creditor of Robert Morris? I have no reference now to

any proceedings under his judgment, or to the validity of that judgment, as it may or may not be affected by time. He has offered some reasons which he thinks should rebut the presumption of satisfaction of his judgment by lapse of time, which may be hereafter adverted to. But that is a secondary question on this application, which is not for the revival of the judgment, or to authorize any proceeding under it. For my present object, I may consider that he has a debt, that might be proved under the commission. He asks that the commission may be reinstated, for the sole purpose of admitting him to that proof. He asks that an order which superseded that commission, and which in the present inquiry is assumed to have been authorized and valid, shall be revoked, that he may have the opportunity to present his claim to the commissioners, and make such proof there of the validity of his debt, as may be in his power. It is clear, then, that the delay, the neglect which he has to account for, is not of his judgment, but of the opportunities which were afforded to him, for thirty years, to do that which he now desires to do. I have no recollection that any explanation, legal or equitable, has been offered for Mr. Sansom's declining for so long a time to prove the debt he now wishes to prove. The four reasons for inaction were applied to his judgment—to his debt, to show that it was not lost by lapse of time. But none of these were used, or could be used, to explain his neglect of the commission, and his entire disregard of the rights under it which he would now recall and reassume. These reasons were—the bankruptcy—the death of Mr. Morris—the difference between a judgment and a bond—and his ignorance of the existence of the Schuylkill county lands. Granting that these may have been the motives for taking no proceeding under his judgment, and without anticipating how effectual they may be to preserve his debt from extinction under the pressure of thirty-five years, it is enough to say, that they do not account for, justify, or explain, his delay to prosecute his rights under the commission.

I will now suppose that this objection is removed or waived; still it is incumbent on the petitioner to satisfy me that he will gain some benefit—some substantial and adequate benefit—by obtaining the prayer of his petition. I will not revoke a decree rightfully and deliberately made, after so long an acquiescence by all interested in it, and most especially after rights have been acquired under it, unless it is clearly shown to me that justice to the petitioner requires it, and that justice will be measured, in part, by the advantage he is to gain by it. If it be clear he can gain nothing, he has no justice to support him—he will be a mere stranger intruding himself into a proceeding in which he has no interest. If his interest be but nominal, or so inconsiderable as not to be worthy of regard, the judge would not disturb a decree

from a repose of six years, and, assuredly, will not put in jeopardy or doubt the interests of others, to gratify such an application. It is a maxim ever of the common law, that "de minimis non curat lex," and new trials have been refused, on the ground of the insignificance of the interest of the party, who otherwise would have been entitled to it. It is clear that, in this case, the petitioner can gain nothing by his petition and the order he prays for, but the opportunity to prove his debt under the commission, and to receive such a dividend of the Schuylkill county lands, which are all the property of the bankrupt known to us, as his debt will entitle him to. The inquiry, then, to which a judge, acting on a broad and equitable discretion, will turn, is, whether the petitioner can obtain this benefit by reopening the commission, and what will it be worth to him? The judgment, which is the evidence of his debt, is now nearly forty years old, almost double the period which the law allows to the existence of it as a debt. His last proceeding on it was in 1805—more than thirty years before his present application. Could the commissioners of the bankrupt admit such a debt to be proved, or such a creditor to participate in the distribution of the effects of the bankrupt? If it stood naked and alone, it is, in my opinion, most manifest, that either the bankrupt, if living—or his representatives, as he is dead,—or any of his creditors, objecting to the admission of such a debt, the commissioners would have no legal right to receive it; and if received, it would be expunged, as in the case in 15 Ves. 479. The examination of the numerous cases on this point has occupied a large portion of the argument of counsel on both sides. I forbear to examine them. The general effect of such a lapse of time upon a judgment is not denied; but it is alleged, that this effect, which is but a presumption of law, may be explained and rebutted by circumstances—by evidence, which, in the opinion of a court and jury, would keep the debt alive; and that the petitioner has a right to go before the commissioners, or to a jury, at his election, to satisfy them that he has such circumstances and evidence as would relieve him from this presumption—would account for his delay, in a manner to preserve his debt. This is true; but in order to induce me to grant his petition on this ground, it is incumbent upon him now, and here, to satisfy me that he has such evidence and such circumstances in his power, not as absolutely as might be required of him by the court, but sufficiently so to convince me that he has some fair and reasonable ground to go upon—some probable legal expectation of making out his case, if the opportunity is accorded to him. In an application to a common law court to open a judgment and let the party into a defence, the court will be well satisfied that he has an available defence, before they will disturb their judgment. It is not enough for him to say—give

me the opportunity, and I will try what I can do with it—he must show to the judge for whose interference he applies in his behalf, what his reasons are, and that he has a good case to exhibit. In the present case, I do not think that, as matter of law, the facts and circumstances relied upon by the petitioner could avail him to avoid the consequences of the lapse of time upon his debt. Should he go to a court, I must presume that the judges would take the decision of the law upon themselves; and as to the facts, taking them to be just as the petitioner has represented them, they are altogether insufficient to entitle him to relief. I do not again repeat them, or go into the detail of my reasons for this opinion. It appears to me to be obvious, that neither the bankruptcy and death of Mr. Morris,. nor the alleged difference in the law between a bond and a judgment, nor the petitioner's ignorance of the lands in question, are sufficient apologies for his neglecting to take the prescribed and ordinary means of keeping his debt alive, for any contingency that might be beneficial to him. Why should I open a commission for such a claim, which, with my opinion of it, I must believe would not be received by the commissioners, or by any other tribunal to which the petitioner might carry it? If I should refuse the prayer of the petitioner, if no reason were offered for his inertness for five-and-thirty years, I may, and ought also to refuse it, when the reasons offered to remedy this defect, are to me clearly insufficient: and particularly when those reasons are of a character that would fall under the dominion of the court, rather than of a jury, consisting of undisputed facts, and leaving the legal inferences from them only to be determined. The effect of the bankruptcy and death of Mr. Morris upon the lapse of time, are, in my opinion. clearly questions of law for the decision of the court, and not of a jury; so also is the supposed difference between a bond and a judgment, in this respect. The fourth reason—that is, the ignorance of Mr. Sansom of the existence of the land in question—is more of a mixed question; but I cannot suppose that either a court or jury would consider it as a good reason for such laches, or as avoiding the legal effect of time upon the debt. If he meant to take the chance of the discovery of property, he should have kept his judgment in a situation to avail himself of it; otherwise, we should, I think, have had heretofore, and shall have hereafter, the same defence set up in very many cases. If it is enough for a plaintiff to say that he did nothing under his judgment, because he did not know of any property to levy it upon. it is obvious how easy it will be to defeat the wise provision of the law which requires diligence of him. The reason is good, perhaps, for not taking out an execution, but certainly it does not account for the neglect to keep the judgment alive, by the inconsiderable trouble and expense of is-

suing a sci. fa. once in every five years. It must be understood, that I do not put my ultimate decision of this case upon this ground. It may be that I am mistaken on it; it may be that the commissioners, or a court and jury, would admit the proof of the debt, notwithstanding the lapse of time against it; it may be·that they would deem the reasons of the petitioner for his inactivity sufficient to rebut the presumption of law; but it will be seen that my argument against the present application, is independent of the existence or non-existence of the debt of the petitioner; although, indeed, if he has no debt, it is, of itself, a sufficient reason for rejecting his petition. But if the judgment had been duly kept alive—if it were now a good and subsisting debt—the objection remains, which I think is fatal to this application to the equity and discretion of the judge, that the petitioner has neglected the matter for thirty-five years, during the whole of which time it was in his power to do that which he now desires to do, and to allow which, he calls upon the judge to review a proceeding of six years' standing, and to revoke a decree under which valuable rights have been acquired. This is the radical defect of his claim. There is no equity in such a petition

There is another consideration, of no imposing weight, in the legal aspect of the case, but which bears strongly upon its equity. If it were certain that Mr. Sansom will take upon himself to proceed with this commission—to have new commissioners and new assignees, who will accept the trust, appointed; and that the commissioners will admit the proof of his debt, and all this must be done, or he has no object or interest in the success of his petition—then I may inquire whether he will have such an interest in revoking the supersedeas, and restoring the commission, whether he can derive such a benefit from it, as will justify me, in the exercise of a sound and equitable discretion, in annulling a decree made so deliberately and so long ago, and in taking the hazard of the wrongs and injuries which it may inflict upon others who have put their faith in the permanency of the decree;—can I hesitate to see on which side the strongest, the preponderating equity lies? It is hardly credible, that the petitioner would proceed with this commission, when, from any calculation I have been able to make on the facts now before me, he could never receive from it one-half of the amount of the expense of his first step. He could not obtain the first meeting of the commissioners for twice the sum he will, if his whole claim is allowed, receive from them. I will not presume that he is struggling to gratify his pride or his resentment by a barren victory, which he never intends to prosecute to any result, but, having succeeded in annulling the supersedeas, will leave the commission as he found it. I confess. that nothing in this case. from the beginning, has been so obscure to me, as

the object of the petitioner. It is admitted that his judgments cannot be aided, as their liens are certainly gone; and indeed no advantage is claimed or expected by him, but to prove his debt, under the bankruptcy, and I have shown what that is worth. It is no answer to say, that if he has any interest, however small, it is enough for this application. He addresses himself to the discretion of the judge, on the equity of his case, and it is the duty of the judge to look to other parties and their equities, which may be affected by his decision.

I might well stop here, but it will, perhaps, be more satisfactory and just to one of the parties who has opposed this petition to say a few words upon a part of the case which has occupied a considerable portion of the discussion, and excited much of its animation. I mean the interest of Mr. Rawle in the supersedeas, and in the lands he has purchased, since it was awarded. The facts are, that a certain judgment was rendered against Mr. Morris, at the suit of Joshua B. Bond, in March, 1797. On this judgment a testatum fi. fa. issued on the 1st February, 1798. Here it rested until April, 1830. In the mean time the plaintiff, J. B. Bond, died, and his administrator, for the use of ·William Rawle, on the 1st day of April, 1830, issued a scire facias against the representatives of Robert Morris, who was also dead, to revive the judgment. On the 6th of December, 1830, judgment was confessed on the scire facias, by Mr. Williams, who appeared as the attorney of the defendants. The original judgment being thus revived, a fi. fa. was issued which was levied on certain unimproved lands, now in Schuylkill county; they were sold under a venditioni exponas, in October, 1831, and William Rawle, Jun., Esq., was the purchaser for the consideration or sum of $5,100. It is evident that these proceedings, if they were objectionable, can have no direct operation or influence to help the petitioner if his case is defective in itself; so far, indeed, as he has been opposed by the claims of Mr. Rawle, as a bona fide purchaser on the faith of the supersedeas, he may inquire into the character and good faith of the purchase to resist the equity of that claim; beyond this it is of no importance what were the circumstances of that sale and purchase, or who are interested in them. But, in justice to Mr. Rawle, I ought not omit to take some notice of these proceedings. The allegations on the part of the petitioner are, that Mr. Rawle, in truth, paid no money for this purchase, and that the representatives of Mr. Morris are interested with him in the purchase, and that for part of it he is a trustee for them. Is there any force in these objections, either as they apply to the case before me, or for any purpose? If Mr. Rawle was a bona .fide assignee, and holder of Mr. Bond's judgment, and that has not been questioned, there was nothing unusual, improper, or illegal, in his becoming

the purchaser of the property at the sheriff's sale, nor in his being allowed to give a credit on his judgment for the purchase-money. If Mr. Sansom had any objection to this, legal or equitable, he might have called upon the sheriff to bring the money into court, and then the question would have been examined and decided by the proper tribunal, and not left for us on this petition. But he comes here to cure all his delays and delinquencies. It is clear that Mr. Sansom knew that this course was in his power, for the motion was made in the court of Schuylkill county, which refused to consider it for want of jurisdiction, as the process under which the sale was made, had issued from the supreme court. The motion then might have been renewed in the supreme court; and the right of Mr. Rawle to pay for the land in this way, with every other objection connected with it, would have been fully attended to and finally determined. I can see nothing in this objection; it does not impeach the legality or good faith of the sale and purchase. Nor is there anything more in the other objection, that Mr. Rawle is a trustee for the representatives of Mr. Morris as to part of the land. And why may he not be, for part or for the whole? Mr. Rawle appears at the sale, a good and lawful purchaser; he is the highest and best bidder; he is able and willing to comply with all the terms of the sale, and if he does so, is it any objection to his title, or the honesty of the whole transaction, that other persons, the representatives of the original defendant in the suit, are interested in the purchase, are to answer to him for a proportion of the purchase-money, and to share with him a portion of the land? I cannot see it; this is purely an affair between themselves, and is no more liable to objection than if Mr. Rawle, after his purchase, had sold a part of the land to the same persons. This trust, if it existed, had no effect upon the sale, for it is not pretended that it was known, and even now rests only on conjecture. If, however, it was an objection to the sale, it is now too late to make it; the occasion is gone by. "When the sheriff comes to acknowledge his deed, the court may, if there has been fraud or unfair practices, set aside the sale." Whart. Dig. 213. The interest which the representatives of Mr. Morris had in superseding the commission of bankruptcy, and that they expected to derive some benefit from the property which would be liberated by the supersedeas from the operation of the commission, has never been concealed. On the contrary, it was their open and avowed object; and their manner of obtaining it, if free from fraud and unfair practices, is of no moment. The supersedeas was ordered on the application of Henry Morris, one of the children of Robert Morris, and the ground of it was the waste and loss of property, which had taken place by locking it up under the commission, and the

hope of rescuing what might remain. It was known that the effect of the supersedeas would be to annul the commission and all that had been done by, and under it, and to restore to the representatives of the bankrupt the property which had not been legally disposed of. Why did the children of Mr. Morris move in the thing, if they did not expect some benefit from it? Now these representatives appear here as distinct parties, to support for themselves, the order that was made on their petition; and if Mr. Rawle's equity as a purchaser, subsequent to the supersedeas and on the faith of it, were really liable to objection, it cannot affect the rights of the representatives of Mr. Morris, nor the property which has accrued to them by virtue of the supersedeas. Whether the lands purchased by Mr. Rawle constitute the whole property that has reverted to the bankrupt, I do not know, nor, perhaps, can it be certainly known by the parties; but if the commission is reinstated, that, as well as any other that may exist, will be wrested from them and brought back to the power of the commission. If, in superseding this commission, I transcended the powers delegated to me by the law, it is my consolation that it was a null and powerless act, which can do no injury to the rights of the petitioner. On the other hand, if that order was an authorized exercise of my authority and jurisdiction, it is a satisfaction to me, of great value, that I have given a close and attentive hearing to an able and laborious argument on behalf of the petitioner, in which learning and ingenuity were equally displayed, and that in deciding the case, I have omitted no means in my power, of reflection and research, to come to a sound and just conclusion. I order that the petition be dismissed.

On the 30th March, 1838, a petition was presented by N. Potts and Samuel Clement, assignees of the estate of Jacob Clement; Charles W. Smith and Jacob R. Smith, executors of the estate of James Smith; and S. and T. G. Hollingsworth, for the heirs of Jehu Hollingsworth. The petition stated the facts of the issuing the commission, the certificate of discharge, and the cessation of all further proceedings; it set forth the discovery of property belonging to the bankrupt, the death or disqualification of the commissioners, and prayed the appointment of new ones and for further relief. On the same day the court ordered a rule to show cause, on short notice, "why the prayer of the petition should not be granted. Notice to be given to the heirs and representatives of Robert Morris, the bankrupt." The hearing of the parties on the rule was subsequently postponed to the 17th November, 1838.

On the 10th November, 1838, the assignees of the estate of Jacob Clement, deceased, William Thaw, one of the heirs of Benjamin Thaw, deceased, and T. G. Hollingsworth,

one of the heirs of Jehu Hollingsworth, deceased, filed a petition, in which they stated themselves to be creditors of Robert Morris, and reciting the issuing the commission of bankruptcy and the granting a certificate of discharge. They stated that no further steps had been taken to render the property of the bankrupt available to his creditors, owing, as they supposed, to the belief that the unincumbered property was not sufficient to pay more than the expenses of the proceeding. The petitioners then averred that they had recently learned that certain real estate had been discovered, which was alleged to have been the property of Mr. Morris at the time of his bankruptcy, and which ought, therefore, to be applied to the payment of his debts; that they had learned also that. a supersedeas of the said commission had been granted, upon the application of Henry Morris, stating himself to be one of the children of the bankrupt, but not alleging himself to have any interest in the estate; that, in fact, the said Henry had no interest in the estate, as would more fully appear by reference to the wills of the said Robert Morris, and his widow, Mary Morris, copies of which were annexed to the petition; that they had no notice or knowledge of the said application, or of the granting of the supersedeas until. within the last three years, and that they or either of them neither knew or suspected that any proceedings to supersede the said commission had been commenced or were in contemplation. For these reasons the petitioners prayed for a review of the proceedings in reference to the alleged supersedeas, that it might be vacated and commissioners be appointed, the original ones having died or become disqualified; and for further relief. On the same day the court granted a "rule to show cause, on the 17th November, why the prayer of the petition should not be granted." Notice of the rule was accepted by the attorney of Henry Morris, and also by the attorney of Wm. Rawle, Esq., who claimed an interest in the property.

On the 17th November, 1838, the rules came on for a hearing before HOPKINSON, District Judge, and were argued by Meredith for the petitioners, and by Williams, who appeared for Henry Morris, and Tilghman, who appeared for Wm. Rawle, Esq., against the petitioners.

Mr. Meredith, for the petitioners.

The present petitioners appear on different grounds from the former petitioner, Mr. Sansom. He had not proved his debts under the commission, while the present petitioners have done so. At the time of Mr. Sansom's petition, Henry Morris was supposed and assumed to have an interest in the estate, when, in fact, he had none, for all Robert Morris's property was left to his wife; and this court would not have ordered a supersedeas knowingly on the petition of a stranger in interest. In order to show that Henry Morris had no interest, we must ask whether Robert Morris

had a devisable interest in the lands recently discovered, and if not, whether he had a descendible interest in them. It is, however, sufficient for our purpose to show that he had a devisable interest, for which see Jones v. Perry, 3 Term R. 88; Fearne, Rem. 549; Ex parte Paddy, Buck, 235. The petitioners had no notice of the proceedings for the supersedeas. Sansom not being a known creditor —not having proved his debt—could have no notice but by publication; but these petitioners are known creditors, on record, and were entitled to personal notice. In a case like this there is a remedy in England without a supersedeas, as the commission of bankruptcy is a trust; in the first instance, for the creditors, and then for the bankrupt as to any surplus remaining after the creditors are paid. Lowndes v. Taylor, 2 Rose, 365; Hammond v. Attwood, 3 Madd. 158; Saxton v. Davis, 18 Ves. 81; Ex parte Wilson, 1 Atk. 218. It is an error to suppose that the commission is annihilated; it is not so. The judge has ordered that a supersedeas shall be issued, but it never has been issued, and the commission is now in full force, and will so remain till a writ of supersedeas be signed and sealed by the judge. Ex parte Freeman, 1 Ves. & B. 38; Ex parte Leicester, 6 Ves. 429; Ex parte Layton, 6 Ves. 439; 2 Madd. 612; Cooke, Bankr. Law, 536. A supersedeas could never have issued on Henry Morris's petition, as it would have been an order to the commissioners, who were not parties to the application, but were strangers out of court. The issuing of the supersedeas is necessary to give effect to the order for it, for the creditors can be acted upon by the judge only through the commissioners. If the commissioners are dead or disqualified, so that the supersedeas can not be served upon them, new commissioners should be appointed in order to make an effectual service on them, for there can be no supersedeas without the writ.

Mr. Williams, against the petition, commenced to answer the argument, urged on the other side, that a formal writ of supersedeas was necessary, but—

THE COURT stopped him, and desired that he would proceed to the other points, saying that no actual issuing of a writ of supersedeas was necessary here, the court doing by one act what the chancellor does by two; that it was entirely a question of practice which the court had a right to regulate; and that the clerk of the court had repeatedly issued certificates, under seal, of the order superseding the commission.

Mr. Williams continued—On the former hearing, the interest of Henry Morris was admitted, or not disputed, and it is now too late to disturb the proceedings on that ground. These petitioners swear they knew nothing of the proceedings until within the last three years, but admit that length of notice. They left the case on Mr. Sansom's petition, and neither made themselves parties to it, nor of-

fered to do so, and the court having refused to reverse the order for a supersedeas on that petition, they come now, after the lapse of more than a year, to ask that the whole matter may be again reviewed. We are not bound to show title in Henry Morris now; it is at best a mere matter of form, and does not affect the merits of the case in any way whatever, and title will be presumed in him after this lapse of time without a denial. But if we are required to show his title, it is manifest—he was the son of the bankrupt, and he was the executor of the executrix of the bankrupt. The legal estate remained in the bankrupt till the assignment was perfected. Doe v. Mitchell, 2 Maule & S. 446. This right being in the bankrupt, if descendible and not devisable, it comes to Henry Morris as heir or one of the heirs; if devisable, then, as executor of his mother, he has sufficient interest in the estate to go into the orphans' court and ask an order of sale, &c., and to petition this court for a supersedeas. Cooper, Bankr. Law, 334; Attorney General v. Capell, 2 Show. 480. The estate remained in the bankrupt's possession over twenty years, and was thereby confirmed to him as against his creditors. Power v. Hollman, 2 Watts, 218; Diemer v. Sechrist, 1 Pa. [1 Pen. & W.] 420. The petitioners say that they were known creditors, but they were also to be presumed to be paid on account of the lapse of time. Peebles v. Reading, 8 Serg. & R. 484. And all Mr. Morris's property now remaining must be considered as surplus, for, from the lapse of time, all the debts must be treated as if paid by the bankrupt or released by the creditors.

Mr. Tilghman, on the same side.

It is now eight years since the supersedeas, during which time all things have been as if Robert Morris had never been a bankrupt. At the time of granting the supersedeas, personal notice was given to J. Huston, the petitioning creditor; and all other creditors were notified by advertisement. These petitioners are bound by this notice and by the decree of the judge precisely as though they had appeared and been heard against the supersedeas. Mr. Rawle became a purchaser, on the faith of the supersedeas; and, since the refusal of Mr. Sansom's petition, he has sold to other parties, who were present at the last hearing of this matter, and purchased on the faith of the decision then made thereon. Eighteen months after the rejection of Mr. Sansom's petition, the present petitioners come forward to disturb the security of these innocent purchasers. Fraud and falsehood in obtaining the supersedeas should be alleged and proved before it can be overthrown. Nothing new is pretended to be in the case now that has not been argued before, except that Henry Morris had no interest in the estate of the bankrupt. To this we answer: (1) The allegation comes too late, the subject has been passed upon; (2) Henry Morris was not alone interested in the

petition, but the whole of the heirs of Robert Morris were concerned; (3) it is immaterial whether he had any interest or not, the object was simply to bring forward the question whether a commission should be superseded or not, and it was the duty of the judge to look to every person who had an interest in the application; (4) he had an interest, he was the executor of Robert Morris's executrix. Kline v. Guthart, 2 Pa. [2 Pen. & W.] 490.

Mr. Meredith, in reply.

The former order was made on the supposition of a state of facts which did not exist; and no notice was given to those who were entitled to it. We cannot doubt that, on our showing the real state of facts, the order will be reversed. The petitioners have an interest in the estate; they are creditors who have proved their debts under the commission. The interested parties— the commissioners or assignees—were not made parties to the proceedings which produced the supersedeas; and no personal notice was given to the creditors residing in the city where the proceedings were held, when, from their local position, they were entitled to it. In the opinion of the court upon Mr. Sansom's petition, Henry Morris is spoken of and considered as the representative and heir of Robert Morris. It now clearly appears that he had no interest. This is a new fact and a new state of things. As the petitioner had no interest in the estate, it is never too late to come in and show it. The objection of there being a bona fide purchaser extends to part only of the property, and that part was bought with full knowledge of all the circumstances. Parties claiming to be protected in this right must show that they have paid the full consideration money. The former decision was on the grounds: (1) That Mr. Sansom had no interest; (2) that Henry Morris had. But now the whole thing is reversed; the present petitioners have interests, and Henry Morris has not. First or last, this thing will be set right. It began in injustice and must end in retribution. This princely estate cannot be withheld much longer from the creditors of the bankrupt.

On the 6th February, 1839, HOPKINSON, District Judge; delivered the following opinion in the case:

The petitioners in this case are, the assignees of the estate of Jacob Clement, deceased, William Thaw, one of the heirs of Benjamin Thaw, deceased, and T. G. Hollingsworth, one of the heirs of Jehu Hollingsworth, deceased. They state themselves to be creditors of Robert Morris, formerly of the city of Philadelphia. The petition recites the issuing of a commission of bankruptcy against Robert Morris in July, 1801, and the granting of his certificate of discharge on the 4th of December of the same year; but that no further steps were taken to render the property of the bankrupt available to his creditors, owing, as the petitioners suppose, to the belief that the unincumbered property was not sufficient to pay more than the expenses of the proceeding. The petitioners then aver that they have recently learned that certain real estate has been discovered, which is alleged to have been the property of Mr. Morris, at the time of his bankruptcy, and which ought therefore to be applied to the payment of his debts. They state that they have also learned that a supersedeas of the said commission has been granted, upon the application of Henry Morris, stating himself to be one of the children of the bankrupt, but not alleging himself to have any interest in the estate of the bankrupt. That in fact the said Henry had no interest in the estate, as will more fully appear by reference to the wills of the said Robert Morris and his widow Mary Morris, copies of which are annexed to the petition. The petitioners say they had no notice or knowledge of the said application of Henry Morris, or of the granting of the supersedeas, until within the last three years, nor did they or either of them, at any time previous, know or suspect that any proceedings to supersede the said commission had been commenced, or were in contemplation. For these reasons the petitioners pray for a review of the proceedings in reference to the alleged supersedeas, that it may be vacated, and that commissioners be appointed, the original ones being dead or disqualified, and for such further relief as may be right and just. This petition was filed on the 10th of November, 1838, and a rule granted to show cause, on the 17th, why the prayer of the petition should not be allowed. Notice was accepted by the counsel of Henry Morris, and also by the counsel for William Rawle, Esq., who claims an interest in the property. In the March preceding, a petition was presented by the same petitioners, with one other, also stating the facts of the issuing of the commission, of the certificate of discharge, and the cessation of all further proceedings. It also sets forth the discovery of property belonging to the bankrupt, and the death or disqualification of the commissioners, and merely prays for the appointment of new commissioners, and for further relief. No reference is made to the supersedeas. On this first petition a rule was granted for a hearing, on a short notice to the heirs and representatives of the bankrupt, but no further proceeding was had upon it, or in relation to the subject, until the 10th day of November following, when the second, or additional, petition was presented and proceeded upon.

On a careful review of the opinion I delivered, with great deliberation, and after a most learned and elaborate argument on both sides, on the petition of William San-

som for a revocation of the supersedeas, I see no reason to change that opinion, as the case was then presented. I now repeat what I then said, that the entire novelty of the case, and the importance of the principles involved in it, gave rise to difficulties of a serious and embarrassing nature.' I did then hope, as I now do, that the final disposal of it would not rest on my judgment, but that some proceeding would be had, as was intimated by the counsel, to bring the case before another tribunal. No such steps have been taken. The inquiry now is, therefore, limited to the question whether any matter of law or fact has been shown which was not brought into my view at the former hearing, and which, if known, would have produced, or ought now to produce, a different result. The subject of the want of notice of the petition of Henry Morris, and the proceedings thereon, was fully discussed and decided at that hearing; and I find nothing in the situation of the present petitioners to distinguish them, in this respect, from the petitioner in that case. The same supineness, the same inattention to the affairs of the bankrupt for five-and-twenty years from the bankruptcy, when the petition of Henry Morris was filed; an entire disregard of that petition and all the proceedings upon it from 1825 to 1838, full thirteen years; not even roused to it by the movement of Mr. Sansom in 1836, when the discovery of property was publicly disclosed, having the same notice which Mr. Sansom had of the occurrences prior to his application—the same and the only notice which the law required, or indeed was practicable in the case. On this question of notice they stand in 'a worse situation than Mr. Sansom. The endeavor to distinguish this case from that decision on the similar petition of Mr. Sansom. in reference to the notice, is this. It is said that these petitioners, having proved their debts under the commission, which Mr. Sansom had not, were entitled to personal notice of the application of Henry Morris; and, as a further claim to this privilege, it was urged that they resided in the city where the proceedings were going on, some of them within a short distance of the court. No authority of the law was shown for any such distinction in the rights of creditors. Neither the statute. nor any judicial adjudication, nor any practice, was shown, or is known to me, to give countenance to this argument. One manner of notice—that is, in the public gazette—is provided for all; and all are bound to attend to it, or the estate of a bankrupt never would or could be settled. In the equity and reason of the thing, the creditors residing in the same city, in the very neighborhood, where the proceedings are going on and the papers published, are less entitled to this personal regard than those who are at a distance. The fact that the present petitioners proved their debts under the commission

only puts in a stronger light their subsequent abandonment of the commission and of all their expectations from it.

The ground mainly relied on to support this application to revoke the supersedeas is, that Henry Morris, on whose petition it was ordered, had no right or interest in the estate of the bankrupt, and, therefore, there was no party before the judge on whose behalf any petition could be received, or any order made in relation to that estate. This objection must be considered and decided. It is well, in the first place, to remark, that Henry Morris, in his petition, makes no false allegation on the subject of his interest. He states the fact of his relationship to the bankrupt, and no more, leaving the question of his interest to those who might choose to deny it, and to the judge whose right it was to decide it. He cannot, therefore, be charged with deceiving or misleading the judge by a false allegation. His petition was filed in November, 1825, nearly twenty years after the death of his father, and a considerable time before the death of his mother, Mary Morris. The will of Robert Morris was proved and recorded in May, 1806, full thirty years before the argument of the motion for the supersedeas, and, of course, during all that time was in the power of Mr. Sansom, and of the present petitioners, and of all and any of the creditors of Robert Morris, to be used by them, had they chosen to use it, to defeat the application of Henry Morris. The will of Mary Morris had been proved and recorded for nearly ten years at the time of the hearing, but no notice was taken of it. The right of Henry Morris as a petitioner was not brought into question by denial or objection. If the petitioner against the supersedeas could waive the objection, he did so; and the present petitioners never appeared to make it. Under these circumstances, the incapacity of Henry Morris, as a party to a proceeding affecting the property of Robert Morris, is certainly urged at this time by these petitioners with no claim to favor. Nevertheless, if the law gives them the right, they must have it. If, by the law, they may demand the revocation of the supersedeas, no minister of the law can refuse it. The objection is that Henry Morris had no interest whatever in the estate of his father, Robert Morris, and, therefore, could be no party to a proceeding to affect that estate; that the order for the supersedeas was made in behalf of a person who could take nothing by it. and had no right to intermeddle with it. Was this strictly and truly the case? Had Henry Morris no interest, present or contingent, sufficient to give him a standing before the judge on that question? Was he so absolutely a stranger to it that he might not be heard upon it? It is clear that Henry Morris, as one of the children of the bankrupt. after his death, had an interest in his estate, whatever it might be, unless that interest had been taken away from him by

some legal act or instrument. The will of Robert Morris is relied upon for that purpose. But a preliminary inquiry is, whether Robert Morris, at the time of his death, had himself such a right and interest in this property as enabled him to devise it. The affirmative of this question is contended for by the petitioners; and it is argued that, if he had a descendible interest in the land, he had a devisable interest, and that if he had not a descendible interest, Henry Morris could derive none from him, and that, in either case, he had nothing to support his petition.

The case in which the principle relied upon by the counsel for the creditors is fully developed and reported is Jones v. Perry, 3 Term R. 88. The point decided is thus stated in the syllabus: "A possibility coupled with an interest is devisable." The case arose upon the construction of the statute of wills, which enables persons having an interest in lands, &c., to devise it. That a mere or bare possibility, unaccompanied by an interest, was not devisable, seems to have been admitted; and the question was as to the kind and degree of interest which, coupled with a possibility, may be the subject of a devise. It is not easy to fix a definite meaning to the word "interest," as here used. Some limitation is clearly intended to be put upon it, for it is said that that which an heir has from the courtesy of his ancestor is but a bare possibility, and has no such interest coupled with it as to be devisable. Yet, if a legal interest can be raised on a calculation of contingencies the most remote and impossible, as in the case before us, it can hardly be denied that the chance of an heir from the courtesy of his ancestor is something better than that of a stranger. I would say that his hope of succession is more rational, more likely to be fulfilled, than any that a bankrupt could have or entertain of the release of his property from the claims of his creditors, or of a return of it to him as amply as it left him, by a supersedeas of the commission which deprived him of it. From the argument of the judges, as well as the counsel, in the case of Jones v. Perry, we may consider that the principle now contended for was carried as far by the court as they would be willing to go with it. We shall see that the interest, the contingency, in that case, was by no means so remote and improbable as to bear any comparison with ours. It was this. A house and lot were devised to T., the brother of the testator, until his son John, or any of his younger sons, should attain the age of twenty-one years; if T. should have no younger son who should arrive at that age, but should have only one son living to that age, then until that son should attain that age. As soon as his said nephew John, or any other younger son of his brother T., should attain the said age, the testator gave the house, &c., to the said John, or such other younger son as for the time being

should be a younger son of his said brother T.; and if the said T. should have but one son who should live to that age, then he devised the house, &c., to that son. The testator died, leaving his brother T. with two sons, the said John and Joseph. John died before his father, and before he was twenty-one years of age. Joseph attained that age, married, and died, having made his will, by which he devised, in the most broad and general terms, all his property and estate, &c., to his wife. The question was whether Joseph had such an interest in the house and lot mentioned in the will of his uncle as enabled him to devise it to his wife. It was decided that he had; and this is the possibility coupled with an interest which is recognised to be devisable by that decision. Now, we clearly see in that case whence the interest of Joseph was derived, and what it was. It was given to him expressly, by the will of his uncle, the first testator, and not by a legal, uncertain, implication. The event on which the interest was to become vested, and the property his, was clearly described; and the event did actually happen. Nor was it so remote or improbable as to deserve to be called a mere possibility. It can hardly be said to have been improbable or unexpected. Thomas, the brother of the testator, had, so far as the case informs us, but two sons, John and Joseph, of whom John was the younger. If, then, John should die before attaining the age of twenty-one years, and Thomas, his father, should have no other younger son, the right of Joseph would be complete. This will was made in June, 1734, and John was not of age in 1751, when he died. Of course, he was but a child at the time of making the will, which lessened his chance of reaching twenty-one years. There was certainly nothing strange in the happening of the contingencies upon which the devise to Joseph would take effect, and, of course, his interest was neither remote or improbable; he had an interest in the estate, with a very fair chance of enjoying it. Can such a case be put in comparison with that under our consideration? Whence did Mr. Morris derive the interest in this property; and what was it which it is said he might dispose of by his will, when the commission of bankruptcy was in full force and operation? Not by any such condition, or contingency, or reservation, in the statute, nor in the assignment of the estate for the use of his creditors, as that by which it is now claimed for him,—not by anything that happened in his lifetime to bring back to him the rights he had wholly and absolutely lost by his bankruptcy. At the time of his death his estate, with all his rights in relation to it, all his interests in it, all his control over it, were entirely vested in others. In the case cited, both the grant and the condition on which it was to take effect were distinctly and expressly declared. Because there were in that case both a probability and an inter-

est, can we say that it is so in ours? If this be no more than doubtful, should I upon it say that Henry Morris has no interest? Shall I refuse to hear him? Shall I take from him the means and the opportunity of having that question deliberately tried and decided by a competent tribunal of law and fact? Why should he not have the opportunity to try this grave question on his father's will? But, while the commission is in his way, he cannot do so. Let him and the creditors meet fairly on that question. If the objection urged against him is good and valid, it will prevail against him; for it was intimated, both on this and the former argument, that the petitioners would not be concluded by my decision, but could have their rights examined and restored to them elsewhere. It is certain that, after his bankruptcy, Mr. Morris had no interest in his property, recognised by the law, which made any act or agreement on his part necessary to the transfer of the property, with a perfect and unquestionable title. The statute immediately vested all his estate in the commissioners; and no conveyance by him was called for. The commissioners afterwards assigned it to assignees chosen by the creditors; and they might afterwards sell to whom they pleased. In all these proceedings the bankrupt has neither lot nor part; he is treated as a stranger, as one who has forfeited all his rights of property by what, legally speaking, was a fraud or an intended fraud upon his creditors. Where is the ground of the suggestion that the legal estate remains in him? Can we believe that, at the time Mr. Morris made his will, he had any view to this property, or to the event which has taken it from his creditors? It is true, he devises all the property, real or personal, which he then possessed or might afterwards acquire; but has this description any application to property which he did not possess? If indeed the commission had been superseded before his death, the property restored to him would be property afterwards acquired; but, to the time of his death, he possessed nothing, he acquired nothing. If, therefore, his intention is to have any influence in the construction of his will, no one, I think, can seriously contend that he looked to an event which would give what is now called a "princely estate" to his wife, in exclusion of all his children. It may be remarked, too, that this probability, this interest (if it may be so called), which is said to be coupled with the possibility, has to pass through two wills with the force and effect of a legal devise, under the general words of all the property, real or personal, possessed by Mr. Morris at the time of his death; and, in the case of Mrs. Morris's will, of all her estate, real and personal; for, if her devise to her daughter, Mrs. Nixon, does not embrace it, then she died without disposing of it, and Henry Morris, either as the son of the testator, or of Mrs. Morris, will have his share in it. May we not confidently

say, too, of Mrs. Morris, that she had no idea she was giving to one of her children, most abundantly and happily provided for, a great estate, in no part of which did she allow her other children, most especially Henry, who did want it, to participate? She had no such thing in her mind. In the case of Jones v. Perry, on the contrary, the testator had distinctly and expressly in his view the contingency by which the estate would vest in his nephew Joseph; and, certainly, he did expect that it might happen, and therefore provided for it.

I am aware that on this argument I must encounter a formidable difficulty. If Robert Morris had no right or interest in this property, how have his children or representatives any, for it is said that whatever is descendible is devisable? In the first place, this objection does not reach all the parties who appear here, and who appeared on the former occasion, to sustain the supersedeas. Some of them are purchasers at a sheriff's sale, under judgments regularly rendered and prosecuted to execution and sale against Robert Morris; and who can have no title if the commission of bankruptcy is restored. They do not claim from or through the children of the bankrupt. In the second place, I refer to what I said in my former opinion, that "the effect of the supersedeas is to annihilate the commission, and to place the bankrupt, with his estate, in the same situation they would have been had it never existed." But if the bankrupt is not in existence, at the time of the supersedeas, it can have no effect upon him; it cannot change his situation in regard to the property. In another place I observed, that "the effect of the supersedeas would be to anul the commission, and all that had been done by and under it, and to restore to the representatives of the bankrupt the property which had not been legally disposed of." The supersedeas in this case, for the reason given, could have no effect on the bankrupt or his personal rights; it could operate only on his estate, for the benefit of his representatives. I do not consider their right as descending from him, but as being cast upon them by the law by an event which, occurring after the death of the bankrupt, vested no rights or interests in him. The right arose by and from the supersedeas, and had no existence before or without it. It has been likened to a bankrupt's interest in a surplus. I grant that the bankrupt had what may be called an interest in the surplus, if any, of his estate; although I should rather say that such surplus would enure to his benefit—would return to him. But this is not a surplus. It does not come to the bankrupt by the same event that would entitle him to the surplus, nor by the same proceedings, nor by virtue of the same legal principles that would restore to him a surplus after the payment of the debts charged upon his estate. The debts for which the property was taken from him being satisfied, the surplus remains

without any claimant in law or equity but himself.

I have, perhaps with more labor than they deserved, given the views which occurred to me on this part of the case. I cannot say that they are altogether satisfactory to myself, nor that they have removed entirely the difficulties of the argument; I should hardly be content to rest a decision upon them. But I will nevertheless say, that I am still less satisfied with the argument to show that Mr. Morris had anything more than a bare possibility of getting back his property from his creditors by this, or any other, contingency; and that such a possibility gave him any right or interest in the property, which he could transmit to another, either by an assignment or a devise. Admitting the devise in the will of Robert Morris to be valid and effectual in relation to this property, has Henry Morris any interest in it, which will support him as a party in these proceedings? The objection raised against him is purely technical and formal, for the real and substantial questions upon the supersedeas, were as fully argued and considered with the creditors, or a creditor having the rights of others, on the one side and Henry Morris on the other, as they could have been with any other party. In such circumstances I shall look with a close and willing eye to discover enough of interest to give Henry Morris a standing before me, to give him a right to be heard on his application. "If the scale do turn but in the estimation of a hair," I shall be satisfied. It is by meting such a measure to him that his right is denied, and he may defend it in the same way. It should be recollected that the whole case was fully and ably argued and carefully examined; that the only creditor of Mr. Morris who appeared to assert any right to his property, chose to meet Henry Morris as a party to the cause, as his authorized adversary; that he made no objection to the original application for the supersedeas on the ground of a want of right or interest in Henry Morris to make it; that these petitioners, and all the other creditors of the bankrupt, had then an opportunity to appear and make this, or any other, objection to the supersedeas; but they left it all to the management of Mr. Sansom, and can we say now that this objection is entitled to any favor? If the hundred creditors of Robert Morris, who proved their debts under the commission, or the many hundreds who did not, may, year after year, or at intervals of many years, come forward singly, or in little parties of three or four, to start new objections to disturb and annul all that had before been solemnly and publicly done, it is impossible that this estate can ever be settled, or the rights of the family of the bankrupt, or of bona fide purchasers, be ever safe and at rest.

Without meaning to insist upon it as a substantial ground, but rather as a set-off, or equivalent, for the argument of the petitioners, we may ask whether Henry Morris had not something like an interest, something like a reasonable expectancy, under the will of his father? He gave all his property to his wife, Mary Morris, saying, that "no doubt she will make such distribution of it amongst our children as she may think proper." This is, at least, a strong recommendation, amounting almost to an injunction, that the property should be divided amongst the children. Henry Morris was one of them; and the probability of his obtaining a share under this recommendation, was not a right it is true. I will not say it was a legal interest, but it was a better contingency than that on which the petitioners rely. At the time Henry Morris filed his petition for the supersedeas, his mother was living, and he had no interest or expectation from his father's estate, but that which depended on the hope that his mother would carry out the recommendation of his father, by a distribution of it amongst their children. It would be enough for the present purpose if, as one of these children, he had a right to bring up the question whether the commission of bankruptcy against his father should continue in force, and whether the conduct of the creditors, and other circumstances of the case, did not warrant a supersedeas of the commission. But another claim, as a party to these proceedings, has been set up for him; to wit, as the executor of the mother, Mary Morris. His petition alleges "that the said Robert Morris, at the time of his bankruptcy, was seised and possessed of a large estate, real and personal, which, in consequence of the neglect of the said creditors and assignees in not duly prosecuting the said commission, has been wasted and misapplied." This allegation was neither disproved nor denied. Mary Morris, under the will of Robert Morris, was entitled to all the real and personal estate which belonged to him at the time of his death, and to whatever right and interest he had therein. Mary Morris died about the month of February, 1827, appointing her sons Thomas and Henry her executors. Can it be questioned that Henry Morris, as the executor of his mother, had an interest in the personal estate, at least, devised to her by her husband; and that he might be a party to any proceeding for the recovery or protection of that estate? Even in regard to the real estate, the laws of Pennsylvania, in certain circumstances and for certain purposes, give an executor an authority over the real estate of his testator. The answer given to this assertion of right is, that at the time Henry Morris filed his petition and commenced this proceeding, his mother was not dead, and, of course, he was not her executor. I see no force in this reply. A petition in a proceeding of this sort is not like a suit at common law, in which the party must have his right of action when he commences it. May not a person who acquires an interest in a suit depending in chancery, after its commencement, come in and be made a party?

Even to satisfy the most scrupulous form, it was only necessary that Henry Morris should file another petition, or in some way suggest to the judge, for there is no record, strictly speaking, of this proceeding, the new and additional capacity in which he presented his claim. The true questions or matters on which he prayed for a supersedeas of the commission were set forth in his petition, and the creditors had notice of it. No new matter of complaint was introduced, no surprise upon his adversaries, no new person as a party; but at the time of the hearing, a new right or interest had accrued to the petitioner, not in the least affecting the merits of the controversy—they remained the same. The creditors. or those of them who chose to appear on the notice. knew, for it was a matter of record and notoriety, of the death of Mary Morris, and the appointment of her executor. They go on to a hearing, without objection to the right or interest of the petitioner, without calling upon him to set out formally his claim in his new capacity, or inquiring in what right or capacity he was prosecuting it. Was not this a waiver of the form of filing a new petition? Did not they consent to meet his claim as it was in truth, and under any right he had to prosecute it? I think that, even if it were material, it has been waived. Such an objection could not be kept in reserve, to be resorted to if the petitioner should be successful. At the time of the hearing, and long before, Henry Morris had the right of a party in this proceeding, in fact and in law; his right was recognised by meeting and answering it without objection, and it would be a strange sort of equity if I were now to undo all that has been done on this ground. In answer to this objection the petitioner has urged that his petition was depending five years without any opposition or appearance by any creditor. The application of the petitioner was renewed in 1830, after the death of Mrs. Morris, and still no opposition to it from any quarter, and so it went on to.the hearing and order thereupon, and so it continued for eight years after that order without objection; and so it was on the hearing of Mr. Sansom without any objection to Henry Morris as a party. Is it not obvious that if in Mr. Sansom's petition, in which he stood for the rights of all the creditors (for none came to join him), this objection had been taken, it would have been at once obviated by allowing Henry Morris to file a supplemental petition? It would be the grossest injustice to admit it now. Even in the more strict proceedings ·at common law, a waiver of an objection at the time it ought to have been made, will. in many instances stronger than this, preclude the party from a subsequent resort to it. Indeed, in the first petition filed by these petitioners, no suggestion is made of this objection. nor until eight months afterwards. Year after year, opportunity after opportunity. were afforded to these petitioners to oppose the petition of Henry Mor-

ris, on this or any other ground, but they do not move or speak, until more than ten years had elapsed from the date of the order of supersedeas, and then ·they appear, relying on the allegation that Henry Morris had no interest in the property when he filed his petition, not denying. for it could not be denied, that he had a clear interest at the time of the hearing and order. Is there any right that a man holds or enjoys by the law, that he may not lose by neglect; that he may not surrender by abandonment? Debts secured by the most solemn contracts, by official records; unquestioned titles to real estates, of any amount and value, even if they should be "princely," may be and have been irrecoverably lost solely and merely by the inattention of the owner. The peace and order of society, the security of the whole community require this, and no individual, who may suffer by it, has any just cause of complaint or reproach. except against himself. For seven-and-thirty years, not without warnings and notice. did these petitioners sleep over the rights they had acquired in the property of Mr. Morris, by his bankruptcy; and they now wake up and expect to find these rights fresh and unimpaired! Not much more than half of this time would have, with the same neglect, swallowed up their mortgages and judgments, their lands and tenements. I know not what there is in their right to a bankrupt's property that will preserve it from the destruction that would have buried their right to their own. The bankrupt law is so far from countenancing neglect and delay in the proceedings on the part of the creditors, that it requires extraordinary promptness to bring them to a close, that the bankrupt and his estate may not be wronged by an unreasonable delay. If the commission is not proceeded upon, in its preliminary proofs for declaring the party a bankrupt, in thirty days, the judge may supersede it. The assignees ·are directed to make a dividend of the effects within twelve months from the issuing of the commission; and the second dividend within eighteen months, which is to be the final dividend, unless there be a suit depending, or some part of the estate standing out, or other effects shall afterwards come to their hands. The whole proceeding is intended to be finished and closed in eighteen months.

As the counsel for these petitioners thinks that the proceedings by which the commission of bankruptcy against Robert Morris was superseded, "began in injustice. and must end in retribution," it is a consolation to me as well as to him, to know that, if I am mistaken in my views of the matter, "first or last they will be set right; and that the princely estate of the bankrupt cannot be much longer withheld from his creditors." I am by no means desirous that the grave questions which have arisen in the course of these proceedings, or any man's property, princely or mean, shall be finally disposed of by my judgment. It is, however, to be regretted, for it has produced

much trouble and expense, that these creditors never thought this great estate, as it is now supposed to be, worth looking after for seven-and-thirty years; that they should have abandoned it; that no one of them, or of the other numerous creditors of the bankrupt, would hazard the expenses of executing the commission, to put them in possession of this principality. The assignees appointed refused to take it into their care and management; would not accept the trust which all thought so worthless; nor did the creditors think it worth their time or money to appoint other assignees. I shall dismiss both the petitions.